# IN THE SUPREME COURT OF TEXAS

No. 17-0365

CHAMBERS–LIBERTY COUNTIES NAVIGATION DISTRICT, ET AL., PETITIONERS,

v.

STATE OF TEXAS, RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

*~consolidated with~*

No. 17-0404

IN RE SUSTAINABLE TEXAS OYSTER RESOURCE MANAGEMENT, L.L.C., RELATOR

ON PETITION FOR WRIT OF MANDAMUS

**Argued January 23, 2019**

JUSTICE BLACKLOCK delivered the opinion of the Court.

This appeal pits two government entities asserting influence over oyster production in and around Galveston Bay. The Chambers–Liberty Counties Navigation District ("District") leased submerged land to Sustainable Texas Oyster Resource Management, L.L.C., ("STORM") for oyster production. The State of Texas sued the District and STORM, seeking to invalidate the

lease under the theory that Texas law affords the Texas Parks and Wildlife Department ("Department"), not the District, the sole power to decide who may and may not cultivate oysters in the disputed area. The State also sought monetary relief against both defendants under sections 12.301 and 12.303 of the Parks and Wildlife Code.

This is an interlocutory appeal arising from the District's plea to the jurisdiction, and we must once again navigate the turbulent waters of governmental immunity. The court of appeals allowed the State's money-damages claims and its *ultra vires* claims to proceed. We conclude that immunity bars the State's claim for monetary relief against the District but does not bar its *ultra vires* claim that the District's officers exceeded their authority by entering into the oyster lease. We therefore reverse the judgment of the court of appeals in part and affirm in part. We also deny a related mandamus petition.

## I. Background

### A. Facts

The Legislature created the Chambers–Liberty Counties Navigation District in 1944. The District operated as a navigation district authorized by Article XVI, Section 59 of the Texas Constitution (entitled "Article XVI, Section 59, Navigation Districts") and Chapter 62 of the Texas Water Code. In 1974, the District converted into a "self-liquidating district" operating under Chapter 63 of the Water Code. *See* TEX. WATER CODE § 63.021(a) ("All navigation districts organized under the provisions of Article XVI, Section 59, of the Texas Constitution, and the provisions of Chapter 62 of this code . . . are self-liquidating in character . . . ."); *id.* § 63.022 ("A [self-liquidating] district . . . may be created . . . to operate under the provisions of Article XVI, Section 59, of the Texas Constitution.").

In 1957 and 1967, the State of Texas conveyed to the District by General Land Office patent more than 23,000 acres of submerged land in and around Galveston Bay. The submerged land contains areas suitable for oyster cultivation. These conveyances were authorized by TEX. REV. CIV. STATS. ANN. art. 8225 (1925), which stated in part:

> Any Navigation District heretofore or hereafter organized under this title or any General Law under which said subdivision may be created shall have the right to purchase from the State of Texas any lands and flats belonging to said State, covered or partly covered by the waters of any of the bays or other arms of the sea to be used by said District for the purposes authorized by law with the right to dredge out or to fill in and reclaim said lands or otherwise improve the same . . . .

In 2014, the District's Commissioners authorized the District to lease most of its submerged land to STORM to cultivate, harvest, and store oysters. The District and STORM executed a lease ("Lease"), which states:

> [STORM] is granted the rights to use and possession, and to protect against trespass and trespassers, which includes but is not limited to the right to deposit rock, shell or other material used to create an oyster bed, the right to use boats, equipment and tools to plant, seed, transplant, cultivate, store or harvest oysters, and the right to mark any private oyster bed (with stakes, pipes, buoys, etc.) and post signs warning the public not to interfere with or damage the oyster bed or take any oyster, rock, shell or thing from the oyster bed; and further includes any applicable littoral or riparian right of the District appurtenant to the Land for the stated purpose and use of this Lease and the exercise of the rights granted to [STORM] in this Lease.

The Lease covered approximately 23,000 acres. STORM pursued the construction of oyster beds. It also sent "No Trespass" notices to holders of oyster-production permits, known as "certificates of location," issued by the Department to other oyster producers. The certificates covered locations within the Lease. These certificates authorize their holder "to plant oysters and make a private oyster bed in the public water of the state." TEX. PARKS & WILD. CODE § 76.006(a). STORM's position was that, despite the Department's issuance of certificates of location to other private oyster farmers, STORM had the exclusive right to seed and harvest oysters within the property

3

covered by the Lease. In addition to the right to post "No Trespassing" signs, the Lease purported to grant STORM the right "to protect the Land, each oyster bed location on the Land and the oysters or material thereon, against trespass and trespassers in the same manner as a freeholder of the Land or oyster bed location." STORM and the District interpret the Lease to give STORM the exclusive right to farm oysters on the land covered by the Lease. The assertion of this right is based on the District's position that it owns the submerged land in fee simple and therefore had the right to convey by lease the authority to cultivate and harvest oysters on the submerged land. The District does not dispute that the waters above the submerged land are property of the State, as section 11.021 of the Water Code provides.[1] Nor does the District dispute that the oysters themselves are personal property of the oyster permit holder by virtue of section 76.035 of the Parks and Wildlife Code.[2] Instead, the District claims that its fee simple ownership of the submerged land and its broad, general statutory authority empower it to lease the submerged land for oyster cultivation.

### B. Trial Court Proceedings

The State of Texas sued the District, its Commissioners in their official capacities, and STORM. The State alleged that the Lease is void because it exceeds the lawful authority of the District and Commissioners, who acted *ultra vires* by entering into it. The State sought a declaratory judgment to that effect. The State also sought monetary damages, which it described

---

[1] "The water of the ordinary flow, underflow, and tides of every flowing river, natural stream, and lake, and of every bay or arm of the Gulf of Mexico, and the storm water, floodwater, and rainwater of every river, natural stream, canyon, ravine, depression, and watershed in the state is the property of the state." TEX. WATER CODE § 11.021(a).

[2] "All oysters taken or deposited in public water by the holder of an oyster permit under the terms of a permit are the personal property of the permit holder." TEX. PARKS & WILD. CODE § 76.035.

4

as "restitution," from the District and STORM under sections 12.301 and 12.303 of the Parks and Wildlife Code.  Section 12.301 states:

> A person who kills, catches, takes, possesses, or injures any fish, shellfish, reptile, amphibian, bird, or animal in violation of this code or a proclamation or regulation adopted under this code is liable to the state for the value of each fish, shellfish, reptile, amphibian, bird, or animal unlawfully killed, caught, taken, possessed, or injured.

TEX. PARKS & WILD. CODE § 12.301.  Section 12.303(a) states:

> The attorney general or the county attorney of the county in which the violation occurred may bring a civil suit under this subchapter in the name of the state to recover the value of each fish, shellfish, reptile, amphibian, bird, or animal unlawfully killed, caught, taken, possessed, or injured.

*Id.* § 12.303(a).  The District and the Commissioners filed a plea to the jurisdiction and a motion to dismiss under Texas Rule of Civil Procedure 91a, asserting that the District's immunity from suit bars the State's claims.  The trial court denied the plea and the motion.

### C.  Proceedings in the Court of Appeals

The District and its Commissioners brought an interlocutory appeal of the order denying their plea to the jurisdiction and motion to dismiss.  *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8).  The court of appeals reversed the portion of the trial court's order that permitted the State to pursue an *ultra vires* claim against the District itself.  565 S.W.3d 1 (Tex. App.—Austin 2016).  It otherwise affirmed the denial of the plea to the jurisdiction.  The court of appeals held that the State could pursue a claim against the District for money damages under the Parks and Wildlife Code.  It held that the State could not pursue *ultra vires* claims against the District itself but could pursue such claims against the Commissioners in their official capacity.  The court of appeals concluded that the Lease exceeds the Commissioners' lawful authority and that the State therefore pleaded a viable *ultra vires* claim against the Commissioners.  STORM did not

5

participate in the interlocutory appeal as a party and did not request party status. Nor did it seek mandamus relief in the court of appeals. Its only participation in the court of appeals was to submit an amicus curiae brief in support of the District's motion for rehearing.

### D. Proceedings in the Supreme Court

The District and Commissioners[3] filed a petition for review in Case No. 17-0365. STORM also a filed a petition for review in Case No. 17-0365, arguing that it should be allowed to participate as a party under the doctrine of virtual representation. STORM separately filed a petition for writ of mandamus in Case No. 17-0404, raising the same substantive arguments regarding the validity of the Lease that it raised in its petition for review.

## II. Analysis

### A. Governmental Immunity

Sovereign immunity protects the State of Texas and its agencies from suit and liability, whereas governmental immunity provides similar protections to the State's political subdivisions. *Travis Cent. Appraisal Dist. v. Norman*, 342 S.W.3d 54, 57–58 (Tex. 2011). The parties do not dispute that the District is a political subdivision of the State for immunity purposes. Governmental immunity therefore bars suits against the District unless the Legislature has waived the District's immunity. *Hall v. McRaven*, 508 S.W.3d 232, 238 (Tex. 2017); *Tooke v. City of Mexia*, 197 S.W.3d 325, 332–33 (Tex. 2006). The Legislature may waive immunity by statute. *Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 853–54 (Tex. 2002). If the

---

[3] We sometimes refer to the District and its Commissioners collectively as the "District" where the distinction between the two is unimportant.

Legislature elects to waive immunity by statute, it must do so by clear and unambiguous language. TEX. GOV'T CODE § 311.034; *Tooke*, 197 S.W.3d at 332–33.

Sovereign and governmental immunity "shield the public from the costs and consequences of improvident actions of their governments." *Tooke*, 197 S.W.3d at 332. One way they do so is by protecting the government from lawsuits for money damages. *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006). Even if a government entity's immunity has not been waived by the Legislature, a claim may proceed against a government official in his official capacity if the plaintiff successfully alleges that the official is engaging in *ultra vires* conduct. *Hall*, 508 S.W.3d at 238. Such claims are commonly known as *ultra vires* claims. *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 633 (Tex. 2010). Plaintiffs bringing *ultra vires* claims must "allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009). Retrospective monetary relief is generally barred. *Id.* at 374. Only *prospective* injunctive relief is available on an *ultra vires* claim. *Id.* at 374–77.

Procedurally, the assertion of sovereign or governmental immunity implicates the trial court's jurisdiction and may therefore be asserted in a plea to the jurisdiction. *Hous. Belt & Terminal Ry. v. City of Houston*, 487 S.W.3d 154, 160 (Tex. 2016); *Rusk State Hosp. v. Black*, 392 S.W.3d 88, 91 (Tex. 2012). Parties may submit evidence at the plea-to-the-jurisdiction stage, and the trial court's review generally mirrors the summary judgment standard. *Sampson v. Univ. of Tex.*, 500 S.W.3d 380, 384 (Tex. 2018). "If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the fact finder. However, if the relevant evidence is undisputed or fails to raise

7

a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law." *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 227–28 (Tex. 2004); *see also Klumb v. Hous. Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 8 (Tex. 2015). We have recognized that the jurisdictional inquiry may unavoidably implicate the underlying substantive merits of the case when, as often happens in *ultra vires* claims, the jurisdictional inquiry and the merits inquiry are intertwined. *Miranda*, 133 S.W.3d at 228. The trial court's ruling on a plea to the jurisdiction is reviewed de novo on appeal. *Klumb*, 458 S.W.3d at 8. Our analysis includes questions of statutory construction, which we also review de novo. *Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011).

## B. The Claim for Monetary Relief

At the outset, we note that the District's immunity does not disappear merely because the plaintiff is the State of Texas. In *City of Galveston v. State*, 217 S.W.3d 466 (Tex. 2007), we rejected just such a contention. The State argued that the City had no immunity in a negligence suit brought by the State "because the City's immunity is derived from the State." *Id.* at 473. We declined to adopt that line of argument in *City of Galveston*, and the State does not ask us to reconsider it.

The court of appeals held that although the District is generally immune from suit even when the State is the plaintiff, sections 12.301 and 12.303 of the Parks and Wildlife Code combine to waive the District's immunity and authorize the State to pursue money damages against the District. The court reasoned that section 12.301 expressly applies to any "person" who takes shellfish in violation of the Code, and section 311.005(2) of the Code Construction Act defines "person" to include a "governmental subdivision or agency." TEX. GOV'T CODE § 311.005(2).

8

Section 311.005(2) does define "person" broadly to include a "corporation, organization, government or governmental subdivision or agency, business trust, estate, trust, partnership, association, and any other legal entity." However, the court of appeals erred by failing to adequately consider another element of the Code Construction Act and our decisions interpreting it.

Section 311.034 states, in part:

> In order to preserve the legislature's interest in managing state fiscal matters through the appropriations process, a statute shall not be construed as a waiver of sovereign immunity unless the waiver is effected by clear and unambiguous language. In a statute, the use of "person," as defined by Section 311.005 to include governmental entities, does not indicate legislative intent to waive sovereign immunity unless the context of the statute indicates no other reasonable construction.

*Id.* § 311.034. Under section 311.034, the reference to "person" in section 12.301 of the Parks and Wildlife Code cannot create a waiver of immunity "unless the context of the statute indicates no other reasonable construction." The State contends, and the court of appeals agreed, that the only reasonable construction of section 12.301's use of the term "person" includes the District. The State reasons that because the statute penalizes *all* unlawful taking of shellfish, without exception, the statute's reach must include *all* defendants, including political subdivisions like the District.

We previously rejected such an argument in *Rolling Plains Groundwater Conservation District v. City of Aspermont*, 353 S.W.3d 756 (Tex. 2011). In that case, a conservation district sued a city for fees and penalties allegedly authorized under the Water Code. *Id.* at 758. The district relied on section 311.005(2) to argue that immunity was waived because the relevant section of the Water Code applied to any "person." *Id.* at 759. We rejected this reasoning, concluding that section 311.034 prohibits the Water Code's reference to "person" from waiving

9

immunity. We concluded that, in light of section 311.034, one reasonable construction of the Water Code was to limit its refence to "person" to private persons. *Id.* We employed similar reasoning in *Wichita Falls State Hospital v. Taylor*, 106 S.W.3d 692 (Tex. 2003). In *Taylor*, the plaintiff sued under a statute imposing liability on a "mental health facility." Even though the statute included a definition of "mental health facility" that included governmental entities, the Court held that immunity had not been waived in clear and unambiguous terms, because the liability provision "creates a meaningful cause of action against private mental health care facilities, a claim that remains viable even if suit against the government is barred." *Id.* at 700. We contrasted the statute with one where "the provision in question would be meaningless unless immunity were waived." *Id.* at 697. Because the liability provision at issue undoubtedly applied to private facilities, "it is neither without meaning nor purpose if it is construed against waiver," and accordingly there was no waiver of immunity. *Id.* at 700.

Sections 12.301 and 12.303 of the Parks and Wildlife Code are the kind of statutes to which these prior holdings apply. As with the Water Code provision at issue in *Rolling Plains*, the text and context of section 12.301 of the Parks and Wildlife Code do not indicate that the reference to "person" must include governmental entities and that no other reasonable construction is possible. It is plainly not the case that "the provision in question would be meaningless unless immunity were waived." *Id.* at 697. Under *Rolling Plains* and *Taylor*, one reasonable construction of section 12.301 is to apply the statute to natural persons and legal entities other than governmental units. We are therefore required by section 311.034 of the Government Code and our precedent to adopt such a construction. As a result, we conclude that section 12.301's use of the word "person" does not waive the District's immunity.

The State's position is essentially that the District must be considered a "person" because otherwise it would escape the consequences of violating the law. But if that reasoning were enough, then section 311.034 would never have any effect. Any time a statute creating liability for "any person" is construed not to waive immunity, the practical effect is to shield the government from suits under the statute. But that does not make such a construction of the statute unreasonable under our precedent. We have not previously construed section 311.034 in the limited manner for which the State argues, and we decline to do so here.[4] The court of appeals erred in concluding that sections 12.301 and 12.303 of the Parks and Wildlife Code waive the District's immunity from the State's claim for monetary relief.

The State argues that the District's immunity from claims for money damages does not apply when the State seeks "restitution" as opposed to traditional money damages. The State cites no authority for drawing such a distinction, nor could it. "[R]etrospective monetary claims are generally barred by immunity." *Heinrich*, 284 S.W.3d at 374; *see also In re Nestle USA, Inc.*, 359 S.W.3d 207, 212 (Tex. 2012) ("Retrospective monetary claims, even by way of mandamus or declaratory relief, are generally barred by immunity, absent legislative consent."). One of the justifications for immunity is to protect limited government resources, not just from paying money damages but from the costs of litigation itself. *See Reata Constr. Corp.*, 197 S.W.3d at 375 ("A lack of immunity may hamper governmental functions by requiring tax resources to be used for defending lawsuits and paying judgments rather than using those resources for their intended purposes."); *Brown & Gay Eng'g, Inc. v Olivares*, 461 S.W.3d 117, 121 (Tex. 2015) (noting that

---

[4] The State's argument for a limited application of section 311.034 is surprising given how often the State benefits as a defendant from that provision. Those who regularly sue the government can be expected to make such arguments, but curiously here we have the government itself arguing as a plaintiff for an interpretation of section 311.034 that it would vigorously oppose as a defendant.

11

sovereign immunity is "inherently connected to the protection of the public fisc"). Whether the claim is one for actual damages in a common-law suit or a statutory claim for "restitution," both claims seek retrospective monetary relief against the government. Immunity bars them both. The State's claim against the District under sections 12.301 and 12.303 seeks monetary relief and is barred by immunity whether it is a claim for "restitution" or not. *See Rolling Plains*, 353 S.W.3d at 760 (holding that claims for fees, statutory penalties, and costs are claims for "retroactive monetary damages" barred by governmental immunity).

Finally, the State argues that immunity does not apply because the District has no immunity from the State's "regulatory authority." The State cites no Texas case in which immunity was found to be absent when the State sues a local governmental entity for money damages in a "regulatory" capacity. That is not surprising. In the complex realm of sovereign-immunity law, one simple and ancient default rule has stood the test of time: No money damages against the government. *Reata Constr. Corp.*, 197 S.W.3d at 374. The Legislature can waive that rule. *Id.* at 375. But the State does not contend the Legislature has done so for all State-initiated regulatory actions against political subdivisions. Instead, the State asks us to hold that immunity is not implicated at all when the State seeks money damages in a regulatory action against a political subdivision.

The State previously asked for a similar limitation on immunity in *City of Galveston*. We declined the request. We reasoned in part, "In a world with increasingly complex webs of government units, the Legislature is better suited to make the distinctions, exceptions, and limitations that different situations require. The extent to which any particular city, county, port,

municipal utility district, school district, or university should pay damages involves policy issues the Legislature is better able to balance." *City of Galveston*, 217 S.W.3d at 469. Moreover,

> when the State sues a private party, the general public stands to lose nothing; but when the State sues a city, a substantial part of the public will no longer be shielded "from the costs and consequences of improvident actions of their governments." While this case involves $180,000 (a small amount relative to most government budgets), the rule we adopt today must apply even if the claim is for $180 million, or billion.

*Id.* at 472 (quoting *Tooke*, 197 S.W.3d at 332). We reaffirm this reasoning today. If immunity does not apply at all, then the question in a money-damages suit by the State against a political subdivision is the legal question of whether the political subdivision is liable for the damages claimed—not the policy question of whether the political subdivision should spend its resources paying damages instead of providing services to taxpayers. The money to pay those damages, of course, belongs to the taxpayers, not the government officials whose actions created liability. When should local taxpayers be on the hook for "the costs and consequences of improvident actions of their governments"? Some might say never. Others might say the potential for limitless liability would encourage taxpayers to keep a more watchful eye on their government. No court is competent to draw such distinctions. "These are precisely the kinds of issues more suited to the Legislature than the courts." *Id.* This is no less the case in a "regulatory action" than it was in the common-law action at issue in *City of Galveston*.

Through mechanisms like the Tort Claims Act, the Legislature has balanced competing public interests by making the government liable to some injured plaintiffs without exposing the taxpayers to financially crippling money judgments. TEX. CIV. PRAC. & REM. CODE §§ 101.001–.109. Similarly, the Legislature has authorized the State to sue political subdivisions for limited monetary relief in particular circumstances. *See, e.g.*, TEX. GOV'T CODE § 411.209(b) (awarding

13

monetary relief in suits by the Attorney General against cities that improperly regulate firearms). The Legislature has made no such provision for the State's money-damages claims against the District. Instead, the State invites us to open up a bottomless pit of local taxpayer liability bounded only by the discretion of the State's lawyers and the willingness of judges and juries to award damages. Following our precedent in *City of Galveston*, we decline the invitation.

Immunity bars the State's claims against the District for monetary relief under the Parks and Wildlife Code. The court of appeals erred by holding otherwise.

### C. The *Ultra Vires* Claims

In *City of El Paso v. Heinrich*, we held that governmental immunity does not bar a suit that seeks to bring government officials into compliance with statutory or constitutional provisions. 284 S.W.3d at 369. Such "*ultra vires* claims" must be brought against government officials in their official capacity and may seek only prospective injunctive remedies. *Id.*

### 1. Claims Against the District

The court of appeals correctly held that the State's *ultra vires* claim cannot proceed against the District itself. An *ultra vires* claim may name a government official in his official capacity, but the underlying governmental entity remains immune from suit. *Heinrich*, 284 S.W.3d at 372–73. "This is true even though the suit is, for all practical purposes, against the state." *Id.* at 373. We affirm the court of appeals' judgment insofar as it held that immunity bars the *ultra vires* claim against the District itself.

### 2. Claims Against the Commissioners

We also affirm the court of appeals' decision that the State's *ultra vires* claim against the Commissioners in their official capacity may proceed. The court of appeals reasoned:

14

> In light of the statutory grant of authority over oysters to the Department, the absence of any such statutory authority vested in the Commissioners, and the lease for a private commercial purpose, and construing the pleadings liberally in favor of jurisdiction, accepting the allegations as true, and applying the applicable statutory provisions to the facts before us, we conclude that the State has asserted that the Commissioners acted beyond their statutory authority by entering into the Lease with STORM and thus has properly asserted an ultra vires claim against the Commissioners.

565 S.W.3d at 11. We agree.

Under *Heinrich*, the State has adequately alleged that the Commissioners exceeded their statutory authority by leasing submerged land to STORM for oyster cultivation. *Heinrich* explained that an *ultra vires* claim is available if the officer "acted without legal authority or failed to perform a purely ministerial act." 284 S.W.3d at 372. We further analyzed the nature of a claim that state officials acted without legal authority in *Houston Belt & Terminal Railway v. City of Houston*. In that case, we explained that an official acts without legal authority when he "exceeds the bounds of his granted authority or if his acts conflict with the law itself." *Hous. Belt*, 487 S.W.3d at 158. "[G]overnmental immunity protects exercises of discretion, but when an officer acts beyond his granted discretion—in other words, when he acts without legal authority—his acts are not protected." *Id.* at 163. He acts without legal authority—"beyond his granted discretion"— if he exercises judgment or limited discretion "without reference to or in conflict with the constraints of the law authorizing the official to act," because "a public officer has no discretion or authority to misinterpret the law." *Id.* (quoting *In re Smith*, 333 S.W.3d 582, 585 (Tex. 2011) (orig. proceeding)). Hence, "governmental immunity only extends to those government officers who are acting consistently with the law." *Id.* at 164.

Under these authorities, the State has pleaded a cognizable *ultra vires* claim if its allegations establish that the Commissioners acted beyond their lawful authority by entering into

15

the Lease with STORM. In other words, in order to determine whether the State's *ultra vires* claim may proceed, we must determine whether, based on the limited record in this interlocutory appeal, we agree with the State that the Lease conflicts with state law.

Our analysis of the immunity questions raised in this interlocutory appeal requires a review of the Lease and other evidence and legal questions that necessarily implicate the underlying merits of the State's case. But, as noted, this review is sometimes necessary at the jurisdictional stage. *Miranda*, 133 S.W.2d at 228; *State v. Lueck*, 290 S.W.3d 876, 880 (Tex. 2009) ("[W]hen the facts underlying the merits and subject-matter jurisdiction are intertwined, the State may assert sovereign immunity from suit by a plea to the jurisdiction, even when the trial court must consider evidence necessary to resolve the jurisdictional issues raised." (citation and internal quotation marks omitted)); *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000) ("[A] court deciding a plea to the jurisdiction is not required to look solely to the pleadings but may consider evidence and must do so when necessary to resolve the jurisdictional issues raised.").[5]

To determine whether the District, through its Commissioners, acted beyond its legal authority, we first examine the sources of that authority. The District's authority derives from Article XVI, Section 59 of the Texas Constitution. Section 59(a) provides that, among other

---

[5] *See also Texans Uniting for Reform & Freedom v. Saenz*, 319 S.W.3d 914, 931 (Tex. App.—Austin 2010, no pet.) ("[T]he pure legal question of whether pled and un-negated facts would establish . . . ultra vires conduct can—and must—be resolved to determine the trial court's jurisdiction, and this is true regardless of whether that issue parallels the merits.") (quoting *Creedmoor–Maha Water Supply Corp. v. Tex. Comm'n on Envtl. Quality*, 307 S.W.3d 505, 516 n.8 (Tex. App.—Austin 2010, no pet.)); *Combs v. City of Webster*, 311 S.W.3d 85, 95 (Tex. App.—Austin 2009, pet. denied) ("Appellees are correct that the proper interpretation of the tax code provisions at issue overlaps with the merits of appellees' claims. However, we must construe these same statutes in our jurisdictional inquiry because if we determine as a matter of law that the Comptroller's actions were within her statutory authority, then appellees' claims are not ultra vires claims, the Comptroller's sovereign immunity against appellees' claims has not been waived, and the Comptroller's plea must be granted and appellees' claims dismissed."); *City of Celina v. Dynavest Joint Venture*, 253 S.W.3d 399, 402 (Tex. App.—Austin 2008, no pet.) ("Examination of a plea to the jurisdiction sometimes requires resolution of an issue that implicates or overlaps with the merits.").

concerns, "the navigation of [the State's] inland and coastal waters, and the preservation and conservation of all such natural resources of the State are each and all hereby declared public rights and duties; and the Legislature shall pass all such laws as may be appropriate thereto." TEX. CONST. art. XVI, § 59(a). Section 59(b) states:

> There may be created within the State of Texas, or the State may be divided into, such number of conservation and reclamation districts as may be determined to be essential to the accomplishment of the purposes of this amendment to the constitution, which districts shall be governmental agencies and bodies politic and corporate with such powers of government and with the authority to exercise such rights, privileges and functions concerning the subject matter of this amendment as may be conferred by law.

*Id.* art. XVI, § 59(b). Thus, the "rights, privileges and functions" of the District are limited to those "conferred by law." The source of such law is enactments of the Legislature. The District does not contend that any other source of authority exists. In this regard, the District is not like a home-rule city such as Galveston, which derives some power directly from the Texas Constitution and has "all the powers of the state not inconsistent with the Constitution, the general laws, or the city's charter." *City of Galveston*, 217 S.W.3d at 469 (quoting *Proctor v. Andrews*, 972 S.W.2d 729, 733 (Tex. 1998)).

As noted above, the District was originally created under TEX. REV. CIV. STATS. ANN. art. 8225 (1925), under which the District was granted "the right to purchase from the State of Texas any lands and flats belonging to said State, covered or partly covered by waters of any of the bays or other arms of the sea, to be used by said District for the purposes authorized by law." Again, this statute confirms that the District's purposes are only those which are "authorized by law." Navigation districts created by Article XVI, Section 59 are governed by Chapter 62 of the Water

17

Code. TEX. WATER CODE § 62.021 ("A navigation district may be created in the manner prescribed by this subchapter under Article XVI, Section 59, of the Texas Constitution.").

The District's general authority to acquire and lease land is not in dispute. A district created under Chapter 62 may acquire land. *Id.* § 62.107(a). And it "may lease and grant easements on any part of the acquired land to any person and may charge for the lease or easement reasonable tolls, rents, fees, or other charges." *Id.* § 62.107(b); *see also id.* § 60.038(a) (providing that a district organized under either Article III, Section 52 or Article XVI, Section 59 of the Texas Constitution "may sell or lease all or any part of land owned by it"). But that general authority to lease land is not a license to enter into any lease imaginable. As with any other activity it undertakes, the District may exercise its authority to lease land only when doing so is consistent with its limited statutory purposes "conferred by law." TEX. CONST. art XVI, § 59(b).

The District's lease authority must therefore be considered in conjunction with the numerous other statutory provisions establishing the District's limited purpose: navigation. *See* TEX. WATER CODE § 63.152 ("The [navigation] district may make improvements for: . . . the navigation of . . . coastal water; . . . the preservation and conservation of . . . coastal water for navigation; . . . the control and distribution of storm water and floodwater . . . in aid of navigation; or . . . any purpose stated in Article XVI, Section 59, of the Texas Constitution, necessary or incidental to the navigation of . . . coastal water."); *id.* § 63.153 (listing powers that comprise the "general authority" of a navigation district, including the regulation of waterway and port facilities and the building and operation of things incidental or necessary to the development of ports and waterways); *id.* § 61.116(b) (authorizing the State to lease state-owned lands to navigation districts

18

"only for purposes reasonably related to the promotion of *navigation*," which means "marine commerce and immediately related activities" (emphasis added)).

The sources of legislative authority on which the Commissioners rely do not expressly mention oyster cultivation and harvesting. The closest the Commissioners come to a specific statutory source of such authority is section 61.116(b) of the Water Code, which defines "navigation" as referring "to marine commerce and immediately related activities, including . . . commercial and sport fishing." This language does not expressly refer to oysters, and it is not directly applicable to the District, because Chapter 61 governs districts created under Article III, Section 52 of the Texas Constitution. TEX. WATER CODE §§ 61.001(1), 61.021. Again, the District in today's case was created under Article XVI, Section 59.

Whether, standing alone, the District's generic statutory authority to lease land and regulate commerce and wildlife for navigation purposes is sufficient to authorize it to go into business as an oyster landlord is perhaps a close question. But we need not answer that question because the District's enabling statutes do not exist in a vacuum. To determine whether the Commissioners acted "consistently with the law," *Hous. Belt*, 487 S.W.3d at 164, we must also examine other sources of state law that limit or enlarge the District's legal authority. One such source is the Parks and Wildlife Code, which contains an extensive and exclusive grant of authority to the Department to regulate the harvesting and cultivation of oysters.

We have previously held that if the Legislature has enacted two statutory regimes that arguably govern the conduct of the parties, the regime that more narrowly and with more specificity covers the conduct at issue is presumed to govern. *City of Waco v. Lopez*, 259 S.W.3d 147 (Tex. 2008), involved a retaliation claim where the plaintiff-employee argued that he had a

19

viable claim under the Whistleblower Act. *Id.* at 149–50. The Court held that the claim could only be brought under the Commission on Human Rights Act, because that Act provided a specific and comprehensive remedial scheme that addressed employer retaliation, while the Whistleblower Act provided a more general remedy based on any violation of law. *Id.* at 152–56. Similarly, in *Texas Mutual Insurance Co. v. Ruttiger*, 381 S.W.3d 430 (Tex. 2012), the plaintiff-employee was denied medical benefits governed by the Workers' Compensation Act. We held that the comprehensive and detailed procedures under the Workers' Compensation Act precluded the plaintiff from seeking relief under more general provisions of the Insurance Code. *Id.* at 38–45.

Similarly, in today's case, specific statutes give the Department—not the District— the authority under Texas law to regulate the conservation and harvesting of oysters. Section 1.011(d) of the Parks and Wildlife Code states: "The Parks and Wildlife Department shall regulate the taking and conservation of fish, oysters . . . and all other kinds and forms of marine life . . . in accordance with the authority vested in it by this code." TEX. PARKS & WILD. CODE § 1.011(d). The immediately preceding subsection provides for statewide regulation of the seabed and products of that property: "All the beds and bottoms and the products of the beds and bottoms of the public rivers, bayous . . . bays . . . and of that part of the Gulf of Mexico within the jurisdiction of this state are the property of this state. The state may permit the use of the waters and bottoms and the taking of the products of the bottoms and waters." *Id*. § 1.011(c). Section 12.001(a) of the Parks and Wildlife Code states, without reservation, that the Department "shall administer the laws relating to game, fish, oysters, and marine life." *Id.* § 12.001(a). Section 12.0011(a) states, again without reservation or an indication of shared responsibility, that "[t]he [Parks and Wildlife]

20

department is the state agency with primary responsibility for protecting the state's fish and wildlife resources." *Id.* § 12.0011(a).

More specifically, the Parks and Wildlife Code has an entire chapter—Chapter 76—vesting the Department with detailed authority over the regulation of oysters. Among Chapter 76's forty-plus provisions, section 76.003 provides that oyster beds and reefs other than natural oyster beds are "subject to location by the department." *Id.* § 76.003. Section 76.006 provides for any citizen or corporation to "file a written application with the department for a certificate authorizing the applicant to plant oysters and make a private oyster bed in the public water of the state." *Id.* § 76.006(a). Public water of the state includes the waters of "every bay or arm of the Gulf of Mexico." TEX. WATER CODE § 11.021(a) ("The water of the ordinary flow, underflow, and tides of every . . . bay or arm of the Gulf of Mexico . . . in the state is the property of the state."). Chapter 76 further provides that the Department may not issue an oyster certificate of location for a submerged area larger than 100 acres, and it limits the total amount of submerged land that a single person may control to 300 acres. TEX. PARKS & WILD. CODE § 76.007. Under Chapter 76, the holder of a certificate is protected against trespass "in the same manner as are freeholders." *Id.* § 76.015(a). The certificate holder must pay rental fees to the Department. *Id.* § 76.017. Even with a certificate of location, a person desiring to plant or take oysters must obtain a permit from the Department. *Id.* § 76.031. A permit is also available to persons wishing to take oysters from natural oyster reefs. *Id.* The Department has broad discretion to issue such permits. *Id.* § 76.032 ("The department may issue or refuse to issue a permit to any applicant."). Chapter 76 has another set of provisions concerning oyster boat licenses issued by the Department. *Id.* §§ 76.101–.119.

Finally, the Department has issued extensive regulations covering its authority over oyster production. 31 TEX. ADMIN. CODE §§ 58.10–.70.

The detailed, specific regulatory authority described above does not give way when it comes into conflict with general provisions regarding the authority of navigation districts, none of which relate specifically to oysters. The conflict is more than theoretical. In this case, STORM has attempted to stop oyster cultivation by third parties to whom the Department has granted certificates of location. And the rights granted to STORM under the Lease purport to give it the right to cultivate and harvest oysters over an area vastly exceeding the area permitted under Chapter 76 of the Parks and Wildlife Code.

Given the extensive and exclusive regulatory authority vested in the Parks and Wildlife Department by the Legislature to decide who may cultivate and harvest oysters in state waters, we agree with the State and the court of appeals that, on the limited record in this interlocutory appeal, the Commissioners exceeded their authority by entering into a Lease that purported to grant to STORM the exclusive right to cultivate and harvest oysters on submerged land beneath state waters. The authority to grant such rights rests exclusively with the Department. If it were shared with the District and other similarly situated local governments, the Department could not carry out its statutory obligations unfettered by local interference.

The Commissioners and STORM contend that the District's ownership of the submerged lands in fee simple gives it a property right to lease its land free from the Department's interference. They argue that the District's alleged right to lease its submerged land for oyster cultivation, even though the State regulates the oysters, is like the right of a rancher to lease his land for deer hunting even though the State regulates the wild deer. STORM, in particular, contends that if the District

22

cannot lease its submerged land as it wishes, then no landowner is safe from the Parks and Wildlife Department's interference with property rights. This line of argument is specious. The District is not a private property owner. It is the government. This case has nothing to do with private property rights. The only real estate at issue is public. Unlike private landowners, whose fundamental private property rights pre-date the constitution and are protected by several provisions of it, navigation districts have no private property rights. Any "rights" a navigation district can be said to have come directly from the Legislature, and the Legislature may cabin or limit those "rights" as it sees fit. To the extent the Legislature may have given the District some oblique grant of power to execute oyster-cultivation leases under the Water Code, it took that power away in the Parks and Wildlife Code by vesting specific and exclusive regulatory authority over oyster cultivation in the Department. The statutory-interpretation question before the Court has nothing to do with property rights and everything to do with the scope of authority granted by the Legislature to various components of government. By contrast, a private landowner objecting to state interference with his right to lease his land would have all manner of constitutional, statutory, and common-law arguments that the District does not, and cannot, make. Such a case would look nothing like this one.

Finally, the Commissioners argue that even if the Lease is inconsistent with the Parks and Wildlife Code, that does not make the District's entry into the Lease an *ultra vires* act. Only the District's violation of its "organic authority" in the Water Code or elsewhere could constitute an *ultra vires* act, according to the District. For this proposition, the District points to *Hall v. McRaven*, 508 S.W.3d 232 (Tex. 2017). In *Hall*, we examined whether a Regent of the University of Texas System, Hall, stated an *ultra vires* claim when he alleged that the System's Chancellor,

23

McRaven, failed to grant Hall access to student-admissions information. We held that this claim was not a valid *ultra vires* claim under the peculiar facts presented. McRaven had withheld the documents under his interpretation of a federal privacy law, but he did so under discretion he was granted by the Board of Regents to interpret the federal privacy law. A concern in *Hall* was that every "identifiable mistake" by a governmental official should not give rise to an *ultra vires* claim, lest the doctrine "swallow immunity." *Id.* at 242–43. Relying on *Houston Belt*, 487 S.W.3d at 160, we described the *ultra vires* doctrine as limited to those claims where the government official acted "without state authority" by exceeding "the bounds of his granted authority." *Hall*, 508 S.W.3d at 234, 238. *Hall* also drew a distinction between the misinterpretation of "enabling law" at issue in *Houston Belt* and McRaven's alleged misinterpretation of "collateral" federal law. *Id.* at 242.

The Commissioners seize on *Hall*'s focus on violations of "enabling law" and argue that their actions cannot be *ultra vires* because the Lease does not violate the District's enabling law or organic statutes. But *Hall* does not hold that only violations of a governmental entity's enabling law can give rise to *ultra vires* claims against the entity's officials. Rather, it holds simply that McRaven's alleged misinterpretation of federal law was not an *ultra vires* act. The key factor in *Hall* was that interpretation of federal privacy law, even if in error, had been delegated to McRaven and committed to his absolute discretion by a competent state-law authority, the Board of Regents. To put it plainly, under the unusual circumstances of that case, McRaven's interpretation of federal law could not have been *ultra vires* because he had state-law authority to get federal law wrong.

*Hall* does not prohibit us from consulting the Parks and Wildlife Code or any other state law to identify limits on the District's statutory authority over oyster production. The State's claim

24

is that the Commissioners exceeded their state-law authority when by lease they purported to grant a private party the exclusive right to cultivate and harvest oysters in a large swath of state waters. Such power is vested exclusively in the Department, the State alleges. Unlike Chancellor McRaven, who acted pursuant to a grant of discretion from the Board of Regents, the Commissioners do not have discretion to misinterpret state statutes constricting their authority merely because those statutes appear outside the District's enabling law. Unlike McRaven, the Commissioners acted "without state authority" by exceeding "the bounds of [their] granted authority." *Id.* at 234, 238. The District's alleged actions fit squarely within the *ultra vires* doctrine as we described it in *Hall* and prior cases.

To summarize, on the record presented in this interlocutory appeal, the State has adequately alleged that the Commissioners exceeded their statutory authority by entering into a lease that purports to grant STORM the exclusive right to cultivate and harvest oysters on the District's submerged land. As a result, immunity does not bar the State's *ultra vires* claim—against the Commissioners in their official capacities—to prospectively enjoin the Lease. The trial court did not err in denying the plea to the jurisdiction on this claim, and the court of appeals correctly affirmed the trial court in this regard.

Although we must at the jurisdictional stage answer questions of law that closely resemble the questions that will dictate the ultimate outcome of the litigation, resolution of the merits remains a separate matter from resolution of this interlocutory appeal. Today we decide only that the State's *ultra vires* claim against the Commissioners in their official capacities may proceed in the trial court, where the defendants may continue to defend against all the State's remaining claims on the merits. We will remand the case accordingly.

25

## D. Issues Specific to STORM

Like the District, STORM argues that the Lease is lawful. STORM's attempted participation in this matter raises procedural questions, which we now address.

In Case No. 17-0365, the District's interlocutory appeal of the denial of its plea to the jurisdiction, STORM seeks party status under the doctrine of virtual representation. STORM was not involved in the District's plea to the jurisdiction and, as a private party, it could not file an interlocutory appeal under TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8), which is reserved for orders that grant or deny "a plea to the jurisdiction by a governmental unit."

STORM argues that it should be allowed to participate in Case No. 17-0365 as a party under the virtual-representation doctrine. The virtual-representation doctrine is an equitable doctrine allowing a party to "intervene" on appeal in circumstances where "it will be bound by the judgment, its privity of interest appears from the record, and there is an identity of interest between the litigant and a named party to the judgment." *In re Lumbermens Mut. Cas. Co.*, 184 S.W.3d 718, 722 (Tex. 2006) (orig. proceeding). STORM asserts that it meets these requirements. The State disputes this.

The State argues that the virtual-representation doctrine is limited to situations where a named party whose interest would otherwise overlap with the virtual party's interest has abandoned its position. The State cites numerous cases where it contends the abandonment rationale applied.[6] It argues the doctrine is inapplicable here because the District has steadfastly

---

[6] The State argues that an abandonment rationale for application of the virtual-representation doctrine applied in *In re Lumbermens Mut. Cas. Co.*, 184 S.W.3d 718 (Tex. 2006) (orig. proceeding); *City of San Benito v. Rio Grande Valley Gas Co.*, 109 S.W.3d 750 (Tex. 2003); *Motor Vehicle Bd. of Tex. Dep't of Transp. v. El Paso Indep. Auto. Dealers Ass'n, Inc.*, 1 S.W.3d 108 (Tex. 1999); *Cont'l Cas. Co. v. Huizar*, 740 S.W.2d 429 (Tex. 1987); and *Smith v. Gerlach*, 2 Tex. 424 (1847).

26

maintained its litigation posture in a manner entirely consistent with STORM's arguments. We do not address whether the virtual-representation doctrine only applies where the party with the same interests as the party seeking intervention has abandoned its position. However, we agree with the State that STORM's request for virtual-representation status would be much stronger if the District had for some reason abandoned its litigation posture, leaving STORM without appellate review of arguments it wishes to make to preserve its interest in defending the validity of the Lease. As it stands, the District has remained an able advocate, throughout the appellate process, for the validity of the Lease. STORM has every opportunity to have its arguments considered as an amicus curiae, but it provides no compelling reason it needs to be granted party status.

Even if STORM had made a good case for party status under the virtual-representation doctrine, that status should be denied for procedural reasons. STORM did not seek party status in the court of appeals. Instead, it only filed an amicus curiae brief at the rehearing stage in that court. STORM fails to explain why we should excuse this delay even if it otherwise deserves party status under the virtual-representation doctrine. In considering the timeliness of a party's effort to invoke appellate rights under the virtual-representation doctrine, we consider "the length of time during which the would-be intervenor should have known of its interest in the case before attempting to intervene." *Lumbermens*, 184 S.W.3d at 726. We decline to apply this equitable doctrine here because it was not timely invoked and there are otherwise no equitable considerations that compel its invocation.

STORM's separate mandamus action in Case No. 17-0404 suffers from a similar infirmity. Texas Rule of Appellate Procedure 52.3(e) provides that if a mandamus "petition is filed in the

27

Supreme Court without first being presented to the court of appeals, the petition must state the compelling reason why the petition was not first presented to the court of appeals." STORM does not offer a compelling reason for its failure to seek mandamus review in the court of appeals. The posture of the case in the court of appeals made it obvious that the court might hold that the Lease exceeded the District's statutory authority. Mandamus is an equitable remedy and as such "aids the diligent and not those who slumber on their rights." *Rivercenter Assocs. v. Rivera*, 858 S.W.2d 366, 367 (Tex. 1993) (quoting *Callahan v. Giles*, 155 S.W.2d 793, 795 (Tex. 1941)). STORM's mandamus petition is untimely. Further, mandamus relief is reserved for extraordinary circumstances. *In re Prudential Ins. Co. of America*, 148 S.W.3d 124, 138 (Tex. 2004) (orig. proceeding); *In re Masonite Corp.*, 997 S.W.2d 194, 197, 199 (Tex. 1999). STORM does not demonstrate extraordinary circumstances that make its participation as a party—as opposed to an amicus curiae—essential to a just resolution of the case.

STORM understandably wants to be heard by this Court. It has been. But we need not take the unusual procedural steps of treating it as a party or formally taking up its mandamus petition in order to carefully consider its arguments. Treating STORM's briefing and the arguments of its counsel as those of an amicus curiae, we have understood the impact of our decision on STORM and have fully considered STORM's arguments in deciding this appeal.

### III. Conclusion

For the reasons discussed, in Case No. 17-0365, we reverse the portion of the court of appeals' judgment that allowed the Department's claim for monetary relief against the District to proceed. We render a take-nothing judgment on this claim. We affirm the portion of the court of appeals' judgment rejecting the *ultra vires* claim against the District itself. We render a take-

28

nothing judgment on this claim.  We affirm the portion of the court of appeals' judgment allowing the *ultra vires* claim against the Commissioners to proceed in the trial court.  We remand the case to the trial court for further proceedings consistent with this opinion.  In Case No. 17-0404, we deny the petition for writ of mandamus.

_____
James D. Blacklock
Justice

**OPINION DELIVERED:**  May 10, 2019