

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| PERMIACARE, RAMONA THOMAS IN HER OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR OF PERMIACARE, AND TODD LUZADDER IN HIS OFFICIAL CAPACITY AS DIRECTOR OF MENTAL HEALTH SERVICES OF PERMIACARE, | § § § § § § | No. 08-19-00144-CV |
| | | Appeal from the 83rd |
| Appellants, | § | District Court |
| | § | of Pecos County, Texas |
| v. | § | (TC #P-7934-83-CV) |
| L.R.H. | § | |
| | § | |
| Appellee. | § | |

## **O P I N I O N**

The State of Texas, through the Texas Health and Human Services Commission, and in turn through its contracted agents, provides community mental health services to eligible patients. In this case, one of those patients sued one of those contracted agents along with two of its officials. The suit claims that: (1) the officials failed to follow several mandated statutory and administrative duties, (2) the officials failed to provide services for which the contracting entity had billed Medicaid, and (3) the contracting entity acted in a discriminatory manner in providing services in violation of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

1

Because the contracting entity is deemed to be a state actor, a failure to follow mandated statutory and administrative duties had to be brought as a claim for prospective injunctive relief (also referred to as ultra vires claims) against the officials. Under the federal claims, the patient could sue the entity directly.

In this appeal from the denial of the entity's and the official's plea to the jurisdiction, we conclude that several of the ultra vires claims lack a properly pleaded factual foundation, but that the patient is entitled to an opportunity to re-plead. We conclude that the Medicaid billing claim should have been dismissed, but that the federal claims are properly before the court. The trial court's order on the plea to the jurisdiction is affirmed in part and reversed in part. The case is remanded for further proceedings.

## I. BACKGROUND

Appellant PermiaCare is a local mental health authority and community center which contracted with Texas Health and Human Services (HHS) to provide community mental health services to eligible patients living in Pecos County. Appellant Ramona Thomas serves as its Executive Director, and Todd Luzadder as its Director of Mental Health Services (hereinafter the Officials). L.R.H. is a resident of Pecos County who began receiving services from PermiaCare approximately twenty years before the filing of the lawsuit. During that time, L.R.H. was diagnosed with several mental disorders which all parties acknowledge made her eligible for services.

PermiaCare is required to abide by several statutory and administrative regulations set forth in Chapters 533 and 534 of the Texas Health and Safety Code (hereinafter the "Code"), as well as Title 25 of the Texas Administrative Code (hereinafter the "TAC"). L.R.H. contends that

2

PermiaCare violated several of these Texas statutory and administrative provisions, as well as two federal statutes.

### A. Factual Background

All of the ensuing factual background comes from L.R.H.'s Second Amended Petition, which chronicles a two-year series of events that began in January of 2016. Given the procedural posture of this case, no proof of any of these allegations appears in our record, and at this point they are just that--allegations.

#### 1. *PermiaCare's Caseworkers Report a Probation Violation*

Prior to January of 2016, PermiaCare designated L.R.H.'s "level of care" at LOC-4, which entitled her to receive the highest level of services available. For instance, that level of care afforded her the right to receive supported housing services and also gave PermiaCare the discretion to provide her with cognitive behavioral therapy ("CBT"). Sometime in January of 2016, however, L.R.H. was convicted of assaulting her father and placed on community supervision (probation), the terms of which restricted her from being in her parents' home when her father was present. That restriction was problematic, however, because L.R.H. was living in a trailer with no running water or air conditioning behind her parents' home. L.R.H. claims that after her PermiaCare caseworkers conducted a home visit, they informed her probation officer that she violated the terms of her probation. According to L.R.H., the caseworkers spoke with the probation officer on several occasions for the sole purpose of having L.R.H.'s probation revoked so that she could be committed to a state psychiatric hospital.

#### 2. *PermiaCare Lowers L.R.H.'s Level of Care in September of 2016*

L.R.H.'s probation was indeed revoked on August 18, 2016, causing her to be jailed until August 31, 2016. Because she was in jail and unable to receive services during that time,

3

PermiaCare lowered her level of care to a LOC-1 designation. After her release, it raised her to a LOC-3 designation. L.R.H. contends she did not receive any notice or explanation for why PermiaCare had assigned her to a LOC-3 level, rather than restoring her to a LOC-4 designation. The reduction to a LOC-3 designation meant that she could not qualify for CBT and deprived her of some supported housing services. L.R.H.'s attorney sent a written request on September 12, 2016 to Todd Luzadder, as well as one of her caseworkers, requesting an opportunity to discuss L.R.H.'s treatment plan. PermiaCare responded that the attorney could not have input into L.R.H's treatment plan. L.R.H. further claims that PermiaCare failed to respond to a written request seeking the reason for the reduction of level of care and denied her an opportunity to appeal.

### 3. PermiaCare Raises L.R.H.'s Level of Care in June of 2017

Following her release from jail, L.R.H. moved from her trailer into an apartment, but began experiencing various mental health challenges, which caused her to become disruptive, leading to confrontations with her neighbors and law enforcement. Thereafter, she was admitted to a psychiatric hospital in November and December of 2016, and June of 2017. After her release from the last psychiatric hospital, PermiaCare raised her level of care from a LOC-3 to a LOC-4 designation.

### 4. L.R.H. Requests Additional Services in November of 2017

By October of 2017, L.R.H. again exhibited disruptive behavior at her apartment complex. After she received notices of lease violations from her landlord in November of 2017, her attorney requested emergency crisis services from PermiaCare to address these issues. During this same time period, L.R.H. and her attorney requested that PermiaCare provide therapy from a "professional therapist," and CBT. According to L.R.H., PermiaCare's Client's Rights Officer,

4

told her that the request for CBT had been denied because such therapy was not effective for her diagnosis of schizoaffective disorder; the same officer further informed L.R.H. that she should have received a letter advising her of the denial and explaining her appeal rights.

### 5. L.R.H.'s Appeal is Denied in January of 2018

And again, on January 12, 2018, a caseworker informed L.R.H. that her request for CBT had once again been denied. L.R.H. sent a hand-written letter to PermiaCare stating that she wanted to appeal the decision. Several weeks later, PermiaCare's Client's Rights Officer denied her appeal on the ground that CBT was not appropriate for her diagnosis.

### 6. L.R.H.'s Caseworkers Communicate with Law Enforcement

In the meantime, L.R.H.'s mental health began to further deteriorate. In January 2018, her apartment manager advised L.R.H.'s caseworkers that she was in the midst of a mental health episode. The caseworkers came to the scene, and allegedly advised a police officer that L.R.H.'s outbursts were a "behavioral problem," and that they did not recommend she be hospitalized. In a subsequent episode later that same month, the caseworkers were again contacted. However, rather than going to the scene, one of the caseworkers allegedly called the police and "asked why they had not arrested her." When the police officer informed the caseworker that they believed L.R.H. was having a mental health crisis, the caseworker allegedly told the officer that her conduct was "purposeful and deliberate," that she was "not experiencing psychosis," and that she "should be treated like anyone else violating the law." L.R.H. was neither hospitalized nor jailed on either of these occasions.

### 7. L.R.H.'s Request for Additional Services is Granted in February of 2018

On February 15, 2018, L.R.H. was accused of making a "terroristic threat" against her neighbors. The police contacted PermiaCare requesting it perform a crisis assessment, but her

caseworkers refused to go to the scene. The police consequently arrested L.R.H. And according to L.R.H., the caseworker also contacted her former probation officer for the purpose of having her probation revoked, even though she was no longer on probation at that time. But shortly after she was released on a personal recognizance bond, PermiaCare authorized 16 sessions of "modified CBT."

### 8. L.R.H.'s Caseworkers Communicate with her Landlord

Finally, L.R.H. alleges that on an unspecified date after the above-described incidents, she was doing better, in part because she continued to receive CBT, and in part because Medicaid approved her request to receive the services of a home health care worker. However, L.R.H. claims that she has received lease violation notices and that her caseworkers have informed her landlord that she is "faking the symptoms of her mental illness and that her problems are behavioral and not psychological," thereby jeopardizing her housing situation.

### B. Procedural Background

Based on these allegations, L.R.H. sued PermiaCare, as well as the Officials in their official capacities. L.R.H.'s second amended petition alleges the Officials committed several ultra vires acts by: (1) failing to provide L.R.H. with notice and the opportunity to appeal treatment decisions; (2) failing to allow her to participate in the development of her treatment plan; (3) failing to ensure that her case workers were supervised by licensed health care professionals; (4) billing Medicaid for services that they did not provide to her; and (5) wrongfully allowing her caseworkers to engage in communications with law enforcement officers and her landlord, for the sole purpose of having her jailed or evicted from her housing. She requested a declaratory judgment that the Officials violated their ministerial duties or acted without legal authority in the past, and to enjoin future violations.

6

L.R.H. also alleges that PermiaCare and the Officials intentionally discriminated against her on the basis of her disability in violation of both the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act. For these claims, she sought both compensatory damages and injunctive relief to restrain PermiaCare and the Officials from engaging in future violations of her rights.

PermiaCare filed a plea to the jurisdiction contending that the trial court lacked subject matter jurisdiction to hear these claims based on sovereign immunity. The Officials also urged that L.R.H.'s claims questioned their discretionary medical decisions, rather than the failure to perform any ministerial duties, as required to support an ultra vires lawsuit. In addition, both PermiaCare and the Officials argue that L.R.H.'s claims under the ADA and the Rehabilitation Act should be dismissed because L.R.H. had failed to plead any conduct evidencing malice or ill will as required by both Acts.

The plea to the jurisdiction focused solely on the pleaded allegations as there was no evidence submitted in support of the plea. The trial court denied the plea and this interlocutory appeal follows.

## II. APPLICABLE LAW AND STANDARD OF REVIEW

### A. Pleas to the Jurisdiction

Sovereign immunity implicates the trial court's subject matter jurisdiction and a defendant may properly raise the issue in a plea to the jurisdiction. *Chambers-Liberty Ctys. Navigation Dist. v. State*, 575 S.W.3d 339, 345 (Tex. 2019). In a plea to the jurisdiction, a defendant may challenge either the plaintiff's pleadings or the existence of jurisdictional facts on the ground that they do not support subject matter jurisdiction. *Texas Dep't of Parks and Wildlife v. Miranda*, 133 S.W.3d 217, 225 (Tex. 2004). When a plea to the jurisdiction challenges only the pleadings, the trial court

7

must construe the pleadings liberally in favor of the plaintiff--accepting the allegations as true-- and look to the plaintiff's intent in their pleadings. *Tex. Dep't of Transp. v. Ramirez*, 74 S.W.3d 864, 867 (Tex. 2002); *Miranda*, 133 S.W.3d at 226-27.

At the pleading stage, a plaintiff carries the burden of alleging sufficient facts to "demonstrate that the trial court has subject matter jurisdiction over its claims." *See City of El Paso v. Viel*, 523 S.W.3d 876, 883 (Tex.App.--El Paso 2017, no pet.); *see also Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993) (the plaintiff has the burden of pleading facts which affirmatively show that the trial court has jurisdiction). The question of whether a plaintiff has alleged sufficient facts to meet this burden is a question of law that we review de novo. *Miranda*, 133 S.W.3d at 226; *Viel*, 523 S.W.3d at 883.

If the pleadings do not allege facts sufficient to affirmatively demonstrate jurisdiction, but the pleading defects are curable by amendment, the issue is one of pleading sufficiency, and the plaintiff should be afforded an opportunity to amend. *Texas A & M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 839-40 (Tex. 2007) (noting that unless the pleadings demonstrate an incurable defect, plaintiffs should be given the opportunity to amend, particularly where the trial court denied the defendant's plea to the jurisdiction, as the plaintiff was entitled to stand on his pleadings in light of such a determination). However, if the pleadings affirmatively negate the existence of the trial court's jurisdiction by revealing an incurable defect, then a plea to the jurisdiction may be granted without allowing the plaintiff an opportunity to amend. *Id.* at 840; *Tabrizi v. City of Austin*, 551 S.W.3d 290, 303 (Tex.App.--El Paso 2018, no pet.).

**B. Sovereign Immunity and the Ultra Vires Exception**

Sovereign immunity protects the State, as well as its several agencies, boards, hospitals, and universities, from lawsuits for money damages. *Tex. Nat. Res. Conservation Comm'n v. IT-*

*Davy*, 74 S.W.3d 849, 853 (Tex. 2002); *see also Chambers-Liberty*, 575 S.W.3d at 344 (recognizing that sovereign immunity shields the "public from the costs and consequences of improvident actions of their governments."); *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 694 n.3 (Tex. 2003) (discussing sovereign immunity as it applies to divisions of state government).

A lawsuit against a government actor in their official capacity is effectively a suit against the entity, and the actor generally has the same immunity enjoyed by the entity. *See Univ. of Texas Health Sci. Ctr. at San Antonio v. Bailey*, 332 S.W.3d 395, 401 (Tex. 2011); *see also City of El Paso v. Heinrich*, 284 S.W.3d 366, 380 (Tex. 2009). Texas recognizes an exception to that rule, however, for "ultra vires" acts. *Id.* at 380. But in order to bring an ultra vires claim against a government actor, the plaintiff must "allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act" imposed by law. *Chambers-Liberty*, 575 S.W.3d at 344-45. "Ministerial acts" are those "where the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *City of Houston v. Houston Mun. Employees Pension Sys.*, 549 S.W.3d 566, 576 (Tex. 2018), *quoting Sw. Bell Tel., L.P. v. Emmett*, 459 S.W.3d 578, 587 (Tex. 2015).

A ministerial duty may be imposed by either statute or by an administrative regulation. *See, e.g.*, *Texas Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 622-23 (Tex. 2011) (recognizing that administrative code regulations may impose a ministerial duty on government officials); *Texas Racing Comm'n v. Marquez*, No. 03-09-00635-CV, 2011 WL 3659092, at *5 (Tex.App.--Austin Aug. 19, 2011, no pet.) (mem. op., not designated for publication) (commission rules expressly requiring executive director of the Texas Racing Commission to docket appeals, allowing no room for discretion, was a ministerial duty). Whether a government actor owes a ministerial duty is a

question of law that an appellate court reviews de novo. *See Associated Press v. Cook*, 17 S.W.3d 447, 461 (Tex.App.--Houston [1st Dist.] 2000, no pet.).

### C. Prospective Relief, Standing, and the Mootness Doctrine

Ultra vires acts committed by governmental officials are acts that are by their nature taken without authority, and therefore should not be considered acts of the State. *Luttrell v. El Paso County*, 555 S.W.3d 812, 837 (Tex.App.--El Paso 2018, no pet.). Consequently, ultra vires suits do not attempt to exert control over the State; instead they attempt to "reassert the control of the State over one of its agents," or in other words, they are intended to bring such agents into compliance with the law. *Heinrich*, 284 S.W.3d at 272. Because of this, a plaintiff alleging an ultra vires action against a government official is not entitled to monetary relief, and instead, may only request prospective injunctive relief against government actors to require compliance with their duties going forward. *City of Houston*, 549 S.W.3d at 576 (recognizing that "ultra vires claimants are only entitled to prospective relief"); *see also Chambers-Liberty*, 575 S.W.3d at 344-45 (recognizing that only *prospective* injunctive relief is available for ultra vires claims). Thus, a plaintiff bringing an ultra vires claim must affirmatively allege facts to support a finding that he or she faces an ongoing violation of their rights, and it is insufficient to merely allege that their rights were violated in the past. *See, e.g.*, *Garcia v. City of Willis*, No. 17-0713, 2019 WL 1967140, at *3 (Tex. May 3, 2019) (recognizing that a court lacks authority to grant a plaintiff prospective relief for ultra vires claims when the plaintiff no longer faces the purportedly unconstitutional conduct complained of); *see also Williams v. Lara*, 52 S.W.3d 171, 184-85 (Tex. 2001) (holding that the chance of people being charged with a crime in the future is too speculative to afford standing to challenge an allegedly unconstitutional law).

As a corollary to this principle, in order to have standing to bring a lawsuit, a plaintiff must demonstrate that a "live" justiciable controversy exists between the parties for which a court could offer relief. *City of El Paso v. Waterblasting Techs., Inc.*, 491 S.W.3d 890, 903 (Tex.App.--El Paso 2016, no pet.); *see also State Bar of Tex. v. Gomez*, 891 S.W.2d 243, 245 (Tex. 1994) (justiciability, which is a component of standing, requires the existence of a live "controversy between the parties that will be actually resolved by the judicial relief sought."). Thus, when later events render a controversy moot, the court lacks subject matter jurisdiction to hear the claims, as a justiciable controversy no longer exists between the parties, and a court's judgment could not have any "practical legal effect" on the party's rights. *See Waterblasting Techs., Inc.*, 491 S.W.3d at 903-904; *see also Zipp v. Wuemling*, 218 S.W.3d 71, 73 (Tex. 2007) (case is moot when a "court's action on the merits cannot affect the rights of the parties.").

PermiaCare has not raised any mootness claim, but justiciability is a threshold issue that implicates a court's subject matter jurisdiction, and we are required to address it sua sponte. *See Texas Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 507 n.15 (Tex. 1995); *Waterblasting Techs., Inc.*, 491 S.W.3d at 904.

## III. L.R.H.'S ULTRA VIRES CLAIMS

### A. Notice and an Opportunity to Appeal

In her first ultra vires claim, L.R.H. alleges that the Officials at various times either reduced her level of services or denied her requests for specific services (namely CBT) without affording her notice of their decisions or an opportunity to appeal in derogation of state law. The Officials do not expressly address this claim, and instead argue that virtually all of L.R.H.'s claims center on her complaints about the various discretionary treatment decisions they made over the last two years. Accordingly, the Officials urge those decisions do not come within the purview of an ultra

11

vires claim. ) While we agree that L.R.H. cannot use this suit to challenge discretionary treatment decisions, we conclude that the complaint actually focuses on whether the Officials violated specific ministerial duties that are set forth in the Code and TAC.

### 1. The Relevant Code Provisions

Several statutory and administrative regulations require local mental health authorities to provide notice and an opportunity to be heard when an individual receiving services is dissatisfied with the authority's treatment decisions. In particular, the Code requires local mental health authorities to notify individuals receiving services in writing of "the denial, involuntary reduction, or termination of services and of the right to appeal those decisions." TEX. HEALTH & SAFETY CODE ANN. § 534.0675. Section 401.464 of the TAC similarly provides that a local authority and its contractor must take steps to assure that persons receiving services "(1) have a method to express their concerns or dissatisfaction; (2) are assisted to do so in a constructive way; and (3) have their concerns or dissatisfaction addressed through a review process." 25 TEX. ADMIN. CODE § 401.464 (2019) (Dep't of State Health Servs., Notification and Appeals Process). In particular, the TAC provides that a person receiving services, or her legally authorized representative, may complain about a decision reducing services by making a request in writing that the decision be reviewed. *Id*. § 401.464(f). Upon request, the review must typically begin within 10 days, and be completed within 10 working days thereafter, and it must result in a decision to "uphold, reverse, or modify the original [treatment] decision." *Id*. § 401.464(g). Thereafter the person receiving services must be given an "opportunity to express his or her concerns in person or by telephone to the individual reviewing the decision." *Id*. Following the review, the authority must provide the person with its final decision and the reasons for its decision. *Id*. § 401.464(h).

When used in a statute, the term "must," denotes a mandatory, rather than a discretionary duty. *City of Houston*, 549 S.W.3d at 588 (noting that the use of the term "shall" in a statute connotes a mandatory duty); *see also In re Robinson*, 175 S.W.3d 824, 831 (Tex.App.--Houston [1st Dist.] 2005, no pet.) (recognizing that the "mandatory" term "must" imposes a ministerial duty). Conversely, use the word "may", this typically denotes that the government official has discretion in his or her actions. *In re Robinson*, 175 S.W.3d at 830, *citing* TEX.GOV'T CODE ANN. § 311.016(1), (2). Discretionary acts are those that "require the exercise of judgment and personal deliberation." *City of Houston*, 549 S.W.3d at 576.

Based on the use of the terms "shall" and "must" in the relevant Code and TAC provisions, we agree that the Officials owed L.R.H. a ministerial duty to provide her with notice and an opportunity to appeal treatment decisions. *See id.* at 588. We therefore conclude that L.R.H. correctly labels the requirement of giving notice and an opportunity to appeal treatment decisions as a ministerial duty.

### 2. *L.R.H. has Pled only Past Violations of Ministerial Duties*

L.R.H. alleges that PermiaCare repeatedly deprived her of notice of treatment decisions, or an opportunity to appeal those decisions. The Officials, however, argue that at least some of the requests for an appeal were made by L.R.H.'s attorney, and that L.R.H. failed to allege that her attorney was authorized to make the requests on her behalf. The TAC, however, expressly provides that a "legally authorized representative" of a person receiving services from a local mental health authority may participate in the notice and appeals process. 25 TEX.ADMIN.CODE § 401.464. We therefore conclude that it was sufficient for L.R.H. to allege that her attorney was acting on her behalf in making requests for a review and appeal. L.R.H. therefore properly pled that the Officials engaged in past violations of their ministerial duties.

13

However, this does not end our inquiry, as neither party has addressed the question of whether the Officials are continuing to violate their ministerial duties regarding notice and appeal. A plaintiff bringing an ultra vires claim is only entitled to prospective injunctive relief, and therefore, in order to establish subject matter jurisdiction, L.R.H. had the burden of demonstrating that the Officials were engaging in ongoing violations of their ministerial duties, such that an injunction to restraining future violations would be appropriate. *See Garcia*, 2019 WL 1967140, at *3.

To be sure, L.R.H. alleges that the Officials have violated their duty to provide written notice and an opportunity to appeal on past occasions when they reduced, terminated, or denied case management services. As to actions in the future, the petition only states that the Officials "continue to violate" their ministerial duties. However, conclusory allegations in a pleading are insufficient to meet a plaintiff's burden of establishing jurisdiction; instead, a plaintiff must allege specific facts that, if true, would affirmatively demonstrate the court's jurisdiction to hear the case. *See, e.g., State v. Lueck*, 290 S.W.3d 876, 884-885 (Tex. 2009) (recognizing that a plaintiff's pleadings must do more than make bare allegations to survive a plea to the jurisdiction). Moreover, while L.R.H. points to at least two instances in which the Officials allegedly violated their ministerial duties to provide her with notice and an opportunity to appeal (September of 2016 and November of 2017), she pleads that they complied with their duty in January of 2018, when they gave her notice and an opportunity to appeal their decision to deny her request for CBT.[1] Further, L.R.H. alleges that in February of 2018, the Officials reversed their decision, and have been allowing her to receive CBT since that time. Accordingly, L.R.H.'s pleadings in their

---

[1] L.R.H.'s only complaint about the January 2018 appeal stemmed from the fact that PermiaCare sent the letter denying her appeal to the wrong address. She admits, however, that her attorney received the letter shortly thereafter in February of 2018.

14

current form are insufficient to support a finding that there is a live, justiciable controversy existing between the parties or that she is entitled to prospective injunctive relief under this specific claim.

### 3. Opportunity to Amend

Nevertheless, we do not find this defect in L.R.H.'s pleading to be incurable, as it is conceivable that she may be able to amend her petition to affirmatively allege facts to support her claim that the Officials "continue" to violate the above-described ministerial duty.

### B. Right to Participate in her Treatment Plan

In her second ultra vires claim, L.R.H. alleges that the Officials acted in an ultra vires manner by not allowing her to participate in the development or periodic review of her treatment plan, as required by the TAC. The Officials do not expressly address the question of whether they had a ministerial duty to allow L.R.H. to participate in her treatment plan, or whether they breached that duty.

### 1. The Relevant Code Provisions

Section 533.0354 of the Code provides that consumers of mental health services must be engaged in their treatment services. TEX. HEALTH & SAFETY CODE ANN. § 533.0354(a). In addition, the TAC provides, among other things, that a person receiving mental health services has the "right to participate actively in the development and periodic review of an individualized treatment plan . . . and the right to a timely consideration of any request for the participation of any other person in this process, with the right to be informed of the reasons for any denial of such a request." 25 TEX. ADMIN. CODE § 404.154(7) (2019) (Dep't of State Health Servs., Rights of All Persons Receiving Mental Health Services). It further provides that the staff of a local mental health authority "must document in the medical record that the parent, guardian, conservator, or other person was notified of the date, time, and location of each meeting so that he or she could

15

participate." *Id.* As the statute grants an individual receiving services the "right" to participate in their treatment plan and provides that the staff "must" document that they gave notice to the individual, we conclude that the Officials had a ministerial duty to provide L.R.H. with the opportunity to participate in her treatment plan.

### 2. *L.R.H. has Pled only Past Violations of Ministerial Duties*

L.R.H. alleges that the Officials violated the above-described duty on at least two occasions when they created new treatment plans for her in September of 2016 and again in February of 2018, without providing notice or an opportunity to participate. However, once again, while L.R.H. alleges only past violations, and she makes only a conclusory allegation that the Officials "continue" to violate their duty to allow her to participate in her treatment plan. She alleges no facts to support that allegation. Accordingly, L.R.H.'s pleadings in their current form are insufficient to support a finding that there is a live, justiciable controversy existing between the parties or that she is entitled to prospective injunctive relief.

### 3. *Opportunity to Amend*

Nevertheless, we do not find this defect in L.R.H.'s pleading to be incurable, as it is conceivable that she may be able to amend her petition to affirmatively allege facts to support her claim that the Officials "continue" to violate the above-described ministerial duty.

### C. Licensed Health Care Professional Supervision

In her third ultra vires claim, L.R.H. alleges that the Officials acted in an ultra vires manner by not providing her caseworkers with adequate supervision, as required by the Code and the TAC. The Officials do not expressly address the question of whether they had a ministerial duty to provide adequate supervision of her caseworkers or whether they breached that duty.

16

### 1. *The Relevant Code Provisions*

The Code provides that a local mental health authority must generally ensure that services are delivered in a clinically appropriate manner. TEX.HEALTH & SAFETY CODE ANN. § 533.0354(a-2). In turn, the TAC states that a "provider" must develop policies and procedures for the supervision and oversight of staff members who provide mental health rehabilitative services. 25 TEX.ADMIN.CODE ANN. § 416.4(a) (2019) (Dep't of State Health Servs., General Requirement for Providers of MH Rehabilitative Services). Among the requirements, the Code provides that if a "peer provider" (an unlicensed case worker) provides rehabilitative services, that peer provider must be "clinically supervised by an LPHA." *Id*. § 416.4(b). By definition, a LPHA (licensed practitioner of the healing arts), is a staff member who is (1) a physician, (2) a licensed professional counselor, (3) a licensed clinical social worker, (4) a psychologist, (5) an advanced practice registered nurse, (6) a physician assistant, or (7) a licensed marriage and family therapist. *Id.* § 412.303(35). We conclude that the Code's use of the term "must" makes this organizational requirement a ministerial duty that the Officials were obligated to fulfill.

### 2. *L.R.H. Alleges an Ongoing Violation of Ministerial Duty*

L.R.H. alleges that the Officials violated this ministerial duty, as she was assigned--and continues to be assigned--various case managers, who are supervised by other caseworkers, but not by an LPHA as required by the TAC. Further, unlike her other ultra vires claims, there is nothing in L.R.H.'s pleadings to indicate that the Officials have rectified this situation. Accordingly, we conclude that L.R.H. has properly pled that the Officials are engaging in a continuing violation of their ministerial duty to ensure that the caseworkers assigned to L.R.H. are properly supervised, thereby making it possible for a court to grant prospective injunctive relief.

### D. The Medicaid Billing Claim

In her fourth ultra vires claim, L.R.H. alleges that the Officials "acted without authority in billing Medicaid" for services that they did not provide to her on several occasions. L.R.H. contends that the Officials have a ministerial duty to properly bill Medicaid, noting that the TAC only allows them to bill Medicaid for services that it actually provides to its consumers. At oral argument, L.R.H. somewhat transposed this statement, and argued that she was entitled to the services for which PermiaCare had billed Medicaid. As superficially appealing as this argument may be, we reject it.

#### 1. The Relevant Code Provisions

The TAC provides that a "Medicaid provider may only bill for medically necessary" mental health rehabilitative services that are provided face-to-face to eligible participants. 25 TEX.ADMIN.CODE § 416.14(a)(1) (2019) (Dep't of State Health Servs., Medicaid Reimbursement). The same TAC provision then details what services are billable, and which are non-billable. *Id.* § 416.14(a)(b). The TAC does not say, however, that the participant has a right to demand every service that was later billed for. Logically, of course, the provider would not bill for services never provided. To do so potentially exposes the provider to a Medicaid Fraud claim under TEX.HUM.RES.CODE ANN. § 36.101, et. seq. (the TMFPA). But the fact that they may do so is a matter between the Medicaid provider and the State of Texas. Other than as permitted by the TMFPA, the eligible participant does not have a stake in that fight, and thus no right to demand the receipt of every service appearing on the bill.[2]

---

[2] A simple example makes the point. If, for instance, a Medicaid provider billed for a prescription drug which was both never given and medically unnecessary, would the eligible participant really have a right to demand the drug? The issue of the necessity of services is a matter between the provider and the eligible participant, and subject to the TMFPA, the billing is a matter between the provider and the State.

The eligible participant might of course obtain standing on billing matters through the TMFPA. That statute provides that a private party may bring a claim for Medicaid fraud, but that any such action must be brought in the name of the person along with the State, and it must be filed in camera. *Id.* §§ 36.101, 36.102. In addition, the TMFPA provides that the party must serve a "copy of the petition and a written disclosure of substantially all material evidence and information the person possesses on the attorney general in compliance with the Texas Rules of Civil Procedure." *Id.* § 36.102 (a). In other words, the TMFPA gives a private party standing to bring a claim for Medicaid fraud, but only if he or she follows the statutory framework. *See generally Permian Basin Cmty. Ctrs. for Mental Health & Mental Retardation v. Johns*, 951 S.W.2d 497, 502 (Tex.App.--El Paso 1997, no writ) (a plaintiff bringing suit based solely on a statutory cause of action must comply with all mandatory statutory prerequisites before filing suit).

When, as here, standing is conferred by statute, we must use that statutory framework to determine whether a particular party has standing. *See SCI Texas Funeral Services, Inc. v. Hijar*, 214 S.W.3d 148, 154 (Tex.App.--El Paso 2007, pet. denied); *Schecter v. Wildwood Developers, L.L.C.*, 214 S.W.3d 117, 121 (Tex.App.--El Paso 2006, no pet.). If the party fails to establish that they have met the requirements of the statute, they lack standing to bring the claim, and consequently, the court lacks subject matter jurisdiction to hear it.[3] *See, e.g., Tex. Dep't of Prot. and Regulatory Servs. v. Sherry*, 46 S.W.3d 857, 861 (Tex. 2001) (reviewing applicable standing provisions in Texas Family Code to determine whether purported father had standing to bring a SAPCR suit).

---

[3] The Officials raise this issue for the first time on appeal, but because it involves subject matter jurisdiction, which cannot be waived, we find it appropriate to address the issue at this time. *See, e.g., Clint Indep. Sch. Dist. v. Marquez*, 487 S.W.3d 538, 558 (Tex. 2016) (recognizing that "[s]ubject-matter jurisdiction cannot be created by waiver, and parties may raise challenges to subject-matter jurisdiction for the first time on appeal.").

*2. Application*

L.R.H.'s petition did not follow the applicable requirements of the TMFPA as she did not join the State as a party, file her claim in camera, or serve a copy of her petition on the attorney general. We express no opinion on whether she might amend her pleadings in this case to add a TMFPA claim, or whether she might bring it separately in another proceeding. It is enough to say that she cannot assert an ultra vires claim that seeks to have a court order the provision of mental health services simply because they might appear on a billing claim to Medicaid. Therefore, we conclude that her pleadings reveal an incurable defect with regard to the Medicaid billing claim, and that the trial court should have dismissed this ultra vires claim without the opportunity to amend.

**E. Acts Outside the Scope Agency Authority**

And finally, L.R.H. alleges that the Officials acted outside the scope of their authority by allowing staff to make inappropriate statements to third parties. These statements include L.R.H.'s caseworkers informing law enforcement and her landlord about her mental status and making negative comments with the intent to have "her incarcerated and evicted from her home."

*1. The Relevant Code Provisions*

The Officials argue that all of the complained of communications were made as part of PermiaCare's role in providing L.R.H. with "community-based services" as permitted by the Code In particular, they argue that Section 614.017 gives them the authority to engage in "interagency communication for the purpose of facilitating the continuity of care for all of [their] clients." Section 614.017(a) provides that an agency shall:

> [D]isclose information relating to a special needs offender or a juvenile with a mental impairment, including information about the offender's or juvenile's identity, needs, treatment, social, criminal, and vocational history, supervision status and compliance with conditions of supervision, and medical and mental

health history, if the disclosure serves the purposes of continuity of care and services."

TEX. HEALTH & SAFETY CODE ANN. § 614.017(a)(2).

The TAC also allows local mental health authorities to coordinate with law enforcement when providing mental health crisis services. *See, e.g.,* 25 TEX. ADMIN. CODE § 412.321(a)(2) (2019) (Dep't of State Health Servs., Crisis Services) (providing that a local mental health authority must develop and implement policies and procedures governing the provision of crisis services that, among other things, "describe the coordination of crisis services to be required among providers of crisis services, law enforcement, the judicial system, and other community entities").

### 2. The Pleadings Allege Conduct Outside the Caseworker's Authority

As L.R.H. points out, however, Section 614.017(a)(2) is only applicable in limited circumstances. Relevant here, the provision only applies to a "special needs offender" which in turn is defined as "an individual for whom criminal charges are pending or who after conviction or adjudication is in custody or under any form of criminal justice supervision." *Id.* § 614.017(c)(2). But only one of the complained of communications occurred while L.R.H. was on probation. Further, it does not appear that she was facing criminal charges at any of the other relevant times when the alleged communications took place, and L.R.H. therefore could not be considered a "special needs offender" at those times.

Further, the Code only allows for disclosures made for "purposes of continuity of care and services." *Id.* § 614.017(a)(2). The Officials do not explain how some of the caseworkers' alleged communications--particularly, the communication directed at her landlord in which they allegedly stated that L.R.H. was "faking" her symptoms--could have been made for the purposes of "continuity of care and services."

21

Nor does the TAC provision allowing communications with law enforcement authorize all of the statements at issue. At least two of the communications about which L.R.H. complains occurred when her caseworkers were called upon to provide crisis services. In doing so, however, her caseworkers were required to assist her in avoiding incarceration and to reduce her involvement in the criminal justice system. *See, e.g.,* TEX. HEALTH & SAFETY CODE ANN. § 533.0354 (providing that the Department "shall require each local mental health authority to incorporate jail diversion strategies into the authority's disease management practices to reduce the involvement of the criminal justice system in managing adults with . . . schizoaffective disorder, including bipolar and depressive types[.]") The gist of her allegations, however, is that her caseworkers did just the opposite by allegedly encouraging her probation officer to revoke her probation and by later encouraging law enforcement to arrest her while she was suffering from several mental health crisis.

Based on the above, L.R.H.'s caseworkers had some authority to disclose information about her mental health status or to communicate with L.R.H.'s probation officer, law enforcement officials, and perhaps even her landlord, if in fact such communications were made for a legitimate purpose. However, L.R.H. alleges that her caseworkers' communications were made for the wrongful purpose of having her arrested or evicted from her home. Consequently, she has alleged that the caseworkers exceeded the scope of their authority.

### 3. Allegations that the Caseworkers Acted with a Wrongful Intent in the Past

Nonetheless, all of L.R.H.'s pleadings center on allegations that her caseworkers exceeded the scope of their authority in the past, and she has failed to allege that her caseworkers are continuing to act outside the scope of their authority or that she would otherwise be entitled to prospective injunctive relief to enjoin the caseworkers from engaging in any such wrongful

22

conduct in the future. At least some of her allegations center on actions taken by caseworkers who are no longer assigned to her case or who no longer work for PermiaCare. Accordingly, L.R.H.'s pleadings in their current form are insufficient to support a finding that there is a live, justiciable controversy existing between the parties or that she is entitled to prospective injunctive relief on this particular claim.

### 4. Opportunity to Amend

Nevertheless, we do not believe that this constitutes an incurable defect in her pleading, and we therefore find it appropriate to provide L.R.H. with the opportunity to amend her pleading to affirmatively allege facts to support her claim that she is entitled to prospective injunctive relief with respect to this claim.

Accordingly, Appellants' Issue One is sustained in part and overruled in part as set forth above.

## IV. ADA AND REHABILITATION ACT CLAIMS

In their next two issues, PermiaCare and the Officials contend that the trial court erred in denying the plea to the jurisdiction as to L.R.H.'s ADA and Section 504 of the Rehabilitation Act claims. They argue that L.R.H. has not set forth valid claims under either the ADA or the Rehabilitation Act, and that instead, her claims are in effect disguised tort claims for medical malpractice for which the State has not waived its immunity.

### A. Applicable Law

Title II of the Americans with Disabilities Act authorizes suits by private citizens for money damages against public entities that violate Section 12132 of the Act. 42 U.S.C. § 12133. Section 12132 of the Act provides that, "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any such entity."
42 U.S.C. § 12132. The applicable portion of the Rehabilitation Act similarly states that "no otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency[.]" *See* 29 U.S.C.A. § 794(a). The language of Title II generally tracks the language of Section 504 of the Rehabilitation Act; in fact, the ADA provides that "the remedies, procedures and rights" available under Section 504 shall be the same as those available under Title II. 42 U.S.C. § 12133; *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000). Thus, the two Acts should be analyzed together, as the "[j]urisprudence interpreting either section is applicable to both." *Hainze*, 207 F.3d at 799.

To establish a prima facie case of discrimination under both the ADA and the Rehabilitation Act, a plaintiff must show "(1) that [s]he has a qualifying disability; (2) that [s]he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of [her] disability." *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011). Title II of the ADA provides that a public entity includes "any State or local government." 42 U.S.C. § 12131; *see also Schraer v. Texas Health & Human Services Comm'n*, No. 13-12-00702-CV, 2014 WL 586036, at *4 (Tex.App.--Corpus Christi Feb. 13, 2014, no pet.) (mem. op., not designated for publication) (noting that a state agency can be considered a public entity under the ADA).

### B. PermiaCare and the Official's Arguments

PermiaCare and the Officials acknowledge that L.R.H. has a qualifying disability under the ADA and the Rehabilitation Act. However, they contend that in order to have a valid claim under the ADA or the Rehabilitation Act, she was required to allege that she suffered an outright denial of all medical services on the basis of her disability, and it was not sufficient for her to simply allege that she was dissatisfied with the services that she received or the medical treatment decisions PermiaCare made in her case. *See Patterson v. Kerr Cty.*, No. SA-05-CA-0626-RF, 2007 WL 2086671, at *7 (W.D. Tex. July, 18, 2007) ("[a]bsent circumstances showing an outright denial of medical care, a disagreement with reasoned medical judgment does not state a violation of the ADA."); *see also Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1294 (11th Cir. 2005) (indicating that the Rehabilitation Act is not intended to apply to medical treatment decisions); *Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1144 (10th Cir. 2005) (holding that medical decisions and medical negligence are not ordinarily within scope of ADA or the Rehabilitation Act). From this, PermiaCare and the Officials argue that at most, L.R.H.'s claims are nothing more than disguised garden-variety medical malpractice claims for which there is no waiver of governmental immunity. *See, e.g., Patterson,* 2007 WL 2086671, at *7 (holding that negligence claims against medical professionals are state law concerns and are not violations of the ADA).

### C. Analysis

As a preliminary matter, Title II of the ADA allows a qualified individual with a disability to not only allege that a public entity denied them services based on their disability, but that the public entity subjected them to discrimination based on their disability. 42 U.S.C. § 12132. Similarly, the Rehabilitation Act provides that a qualified individual with a disability may not be "subjected to discrimination under any program or activity receiving Federal financial

assistance[.]" *See* 29 U.S.C.A. § 794(a). Therefore, L.R.H. was entitled to allege that PermiaCare subjected her to intentional discrimination in the manner in which it provided her with services. *See, e.g.*, *Perez v. Doctors Hosp. at Renaissance Ltd.*, 624 F. App'x 180, 185-86 (5th Cir. 2015) (hearing-impaired plaintiff, who alleged that hospital intentionally discriminated against her based on her disability in refusing to provide requested services, presented sufficient evidence to raise an issue of fact for trial on her ADA and Rehabilitation Act claims).

L.R.H. alleges that PermiaCare workers had developed a bias against her based on her disability and had intentionally discriminated against her based on that disability over the course of a two-year period in which she was receiving services from them. She further claims that this animus was demonstrated by the actions of her case workers who were attempting to have her jailed or evicted from her housing. In effect, L.R.H. contends that the actions and statements of her case workers support an inference that PermiaCare had developed a bias against her, which caused it to treat her in an intentionally discriminatory manner.

L.R.H.'s allegations of intentional discrimination assert more than mere medical negligence, and thus distinguish this case from the authorities that PermiaCare relies on. Although we express no opinion on whether L.R.H. will be able to come forward with sufficient evidence to support her claims, we believe that her pleading sets forth a sufficient claim that survives the plea to the jurisdiction under the liberal standard by which it must be viewed. *See, e.g.*, *Stumpf v. City of Dallas*, No. 3:15-CV-01944-N, 2016 WL 11472363, at *8 (N.D. Tex. Feb. 26, 2016) (court found that plaintiff made sufficient allegations of disability discrimination under the ADA to survive motion to dismiss, where plaintiff alleged that paramedics had reason to know the plaintiff's disability symptoms were involuntary and yet they responded with profanity and violence).

Appellants' Second and Third Issues are overruled.

## V. CONCLUSION

We sustain several of Appellants' issues that the current allegations are insufficient to allege a course of conduct that would allow the issuance of prospective declaratory relief. We remand those claims, however, because the record does not show that L.R.H. could not replead those allegations. Whether she could in fact amend her pleadings, however, is not for us to say. To validly replead, she would have to affirmatively allege facts that would demonstrate an injury that is "concrete and particularized, actual or imminent [and] not hypothetical." *Garcia*, 2019 WL 1967140, at *3, *citing Heckman v. Williamson County*, 369 S.W.3d 137, 155 (Tex. 2012) (internal quotations omitted). And as with all pleadings, the pleader is under the obligation to allege only those matters that are not groundless and brought in bad faith or groundless and brought for the purpose of harassment. TEX.R.CIV.P. 13.

As to L.R.H.'s Medicaid billing related claim, we reverse that portion of the order on the plea to jurisdiction. We also affirm the trial court's order on the federal ADA and Rehabilitation Act claims. We remand this matter to the trial court for further proceedings in accordance with our opinion.

JEFF ALLEY, Chief Justice

January 31, 2020

Before Alley, C.J., Rodriguez, and Palafox, JJ.