**Opinion issued November 8, 2022**



In The

# Court of Appeals

For The

# First District of Texas

_____

**NO. 01-22-00071-CV**
_____

**CITY OF HOUSTON, Appellant**

**V.**

**MARTHA VOGEL AND MARIA ESCALANTE, Appellees**

**On Appeal from the 269th District Court**
**Harris County, Texas**
**Trial Court Case No. 2019-75683**

**MEMORANDUM OPINION**

In this interlocutory appeal,[1] appellant, the City of Houston, challenges the

trial court's order denying its plea to the jurisdiction in a suit for negligence brought

---

[1]     *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8) (authorizing interlocutory appeal
        from order granting or denying plea to jurisdiction by governmental unit); *Thomas
        v. Long*, 207 S.W.3d 334, 339–40 (Tex. 2006).

against it by appellees, Martha Vogel and Maria Escalante. In its sole issue, the City contends that it retains its governmental immunity and thus the trial court lacks subject-matter jurisdiction over the suit by Vogel and Escalante.

We reverse and render.

## Background

Vogel and Escalante alleged that, on August 3, 2018, they were involved in a traffic accident with a City of Houston Fire Department ("HFD") ambulance operated by a City employee, emergency medical technician ("EMT") J. Brooks. Vogel asserted that she was driving her Toyota Tundra truck southbound in the 5800 block of Hardy Street, with her mother, Escalante, as a passenger. EMT Brooks was driving the ambulance westbound on Euel Street. Vogel alleged that she had the right-of-way at the intersection of Hardy and Euel, and that Brooks "ran a stop sign" governing traffic on Euel, drove across Hardy Street and into her lane of travel, and collided with her truck.

Vogel asserted that the collision "totaled" her truck and that she "sustained substantial injuries." Escalante asserted that she suffered a head injury, fractures to her ribs and left hand, lacerations to her liver, and "severed intestines," requiring surgical repair. Escalante asserted that she continues to suffer "concussion-like symptoms," including impaired vision and balance. Together, they sought personal-injury damages "totaling more than $2,500,000."

2

Vogel and Escalante sued the City, asserting that its employee, EMT Brooks, was negligent in "running the stop sign and causing the accident in question resulting in [their] injuries." They asserted that the trial court had subject-matter jurisdiction over their suit because the City waived its governmental immunity under the Texas Tort Claims Act ("TTCA").[2]

The City filed a plea to the jurisdiction, arguing that the City was entitled to governmental immunity because its employee, EMT Brooks, was entitled to official immunity. In its plea, as amended, the City asserted that this case arises from a motor vehicle collision between an ambulance driven by Brooks, who is an HFD firefighter and EMT, and a Toyota Tundra truck driven by Vogel. HFD EMT C. Ross was a passenger in the ambulance, and Escalante was a passenger in the Toyota. On August 3, 2018, Brooks and Ross responded to an "emergency call." The City asserted that the deposition testimony of both Brooks and Ross established that Brooks activated the emergency lights and siren on the ambulance and drove toward the scene. While en route, Brooks was traveling west on Euel Street and encountered a stop sign at the intersection with Hardy Street. Brooks testified that he stopped the ambulance at the stop sign, checked for cross-traffic, determined that the intersection was clear, and proceeded across Hardy Street. EMT Ross also testified that the ambulance came to a stop at the stop sign and that cross-traffic was "very far off."

---

[2] *See* TEX. CIV. PRAC. & REM. CODE § 101.021(1).

3

As Brooks proceeded to cross over Hardy, however, the truck driven by Vogel, who was traveling south on Hardy Street, "slammed into the side of the ambulance with such force that the ambulance rolled on its side." The City noted that witnesses in a vehicle traveling near Vogel's truck testified that they heard the ambulance siren and saw its emergency lights ahead of them and came to a stop.

The City noted that the TTCA governs the waiver of immunity for tort suits against governmental units and provides only a limited waiver of immunity for such suits in certain narrowly-defined circumstances. The legislature has provided such limited waiver of immunity in suits against governmental entities for damages caused by an employee's negligent operation of a motor-driven vehicle if the employee would be personally liable under Texas law.[3] The City argued that EMT Brooks is entitled to official immunity because, at the time of the collision, he was exercising discretion in responding to an emergency call and performing his duties in "good faith."[4] Accordingly, the City asserted, it is entitled to governmental immunity.

The City also asserted that the TTCA lists certain circumstances in which the limited waiver of immunity does not apply. Here, the City asserted, because it is undisputed that EMT Brooks was responding to a 9-1-1 dispatch to a medical

---

[3]     *See id.*

[4]     *See Telthorster v. Tennell*, 92 S.W.3d 457, 461 (Tex. 2002).

4

emergency at the time of the collision, the TTCA's "Emergency Exception" and "9-1-1 Emergency Service" exception apply and the City retains its immunity.[5] In support, the City attached the affidavit of Brooks's supervisor, HFD Captain T. Gunnels, and excerpts of the deposition testimony of Brooks, Gunnels, Ross, Vogel, Escalante, and witnesses, Alexander Medina and Angel Huerta.

In their response to the City's plea, Vogel and Escalante asserted that their suit falls within the TTCA's waiver of governmental immunity. They asserted that, although an employee is entitled to official immunity from suit arising from his performance of discretionary duties that are within the scope of his authority and that he performs in good faith, the City failed to conclusively establish that Brooks was acting in good faith at the time of the collision.

Vogel and Escalante further argued that the City did not retain its immunity under the TTCA's "Emergency Exception" or "9-1-1 Emergency Service" exception because EMT Brooks violated certain traffic statutes and acted recklessly.[6] They asserted that, even though Brooks was operating an emergency vehicle, "he still had an obligation to yield the right-of-way to [Vogel], who did not have a stop sign, or other traffic control device," and that fact issues exist as to whether Brooks "entered the intersection despite being totally blocked from visually determining whether the

---

[5]     *See* TEX. CIV. PRAC. & REM. CODE §§ 101.055(2), .062(b).

[6]     *See id*. §§ 101.055(2), .062(b).

5

intersection was clear."  To their response, Vogel and Escalante attached a field diagram and photographs of the scene, the affidavit of James Evans, an accident reconstructionist, and excerpts of the deposition testimony of Gunnels, Brooks, Ross, Medina, and James Beasley, an HFD firefighter/EMT.

After a hearing, the trial court denied the City's plea to the jurisdiction.

## Governmental Immunity

In its sole issue, the City argues that the trial court erred in denying its plea to the jurisdiction because it conclusively established EMT's Brooks's official immunity, and thus it retained its governmental immunity from the suit by Vogel and Escalante.  The City also asserts that it conclusively established that the TTCA's "Emergency Exception" and "911 Emergency Service" Exception apply and thus it retained its immunity.

### Standard of Review and Principles of Law

Under the common-law doctrine of sovereign immunity, the state cannot be sued without its consent.  *City of Hous. v. Williams*, 353 S.W.3d 128, 134 (Tex. 2011). "Governmental immunity operates like sovereign immunity to afford similar protection to subdivisions of the State," including cities.  *Harris Cnty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004).  "[G]overnmental immunity has two components: immunity from liability, which bars enforcement of a judgment against a governmental entity, and immunity from suit, which bars suit against the entity

6

altogether." *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006). Governmental immunity from suit deprives a trial court of subject-matter jurisdiction. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225–26 (Tex. 2004).

The City of Houston is a governmental entity generally immune from tort liability except when its immunity has been specifically waived by the legislature. *City of Hous. v. Rushing*, 7 S.W.3d 909, 914 (Tex. App.—Houston [1st Dist.] 1999, pet. denied). Under the doctrine of governmental immunity, the City cannot be held liable for the torts of its employees unless its immunity has been waived. *Mount Pleasant Indep. Sch. Dist. v. Est. of Lindburg*, 766 S.W.2d 208, 211 (Tex. 1989).

Under the TTCA, the legislature has provided a limited waiver of immunity from suits against governmental units for damages and injuries "proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment" if:

(A)   the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle . . . ; and

(B)   *the employee would be personally liable* to the claimant according to Texas law; . . . .

TEX. CIV. PRAC. & REM. CODE § 101.021(1) (emphasis added); *Ryder Integrated Logistics, Inc. v. Fayette Cnty.*, 453 S.W.3d 922, 927 (Tex. 2015).

7

Generally, governmental employees are protected from personal liability by official immunity. *Univ. of Hous. v. Clark*, 38 S.W.3d 578, 580 (Tex. 2000). A governmental employee is entitled to official immunity from suit arising from (1) the performance of discretionary duties (2) that are within the scope of the employee's authority, (3) provided that the employee acts in good faith. *Telthorster v. Tennell*, 92 S.W.3d 457, 461 (Tex. 2002). "[O]fficial immunity is designed to protect public officials from being forced to defend their decisions that were reasonable when made, but upon which hindsight has cast a negative light." *Id.* at 463. If the governmental employee is protected from liability by official immunity, then the governmental employer is shielded from liability by governmental immunity. *Clark*, 38 S.W.3d at 580.

Even if immunity is waived under section 101.021, however, the legislature has provided for certain "Exclusions and Exceptions" from the applicability of the TTCA. *See* TEX. CIV. PRAC. & REM. CODE §§ 101.051–.067; *Delaney v. Univ. of Hous.*, 835 S.W.2d 56, 58 (Tex. 1992) (noting that such exceptions are not "prohibition[s] of certain actions against the government," but "exception[s] to the limited waiver of immunity brought about by the [TTCA]"); *City of Hous. v. Nicolai*, 539 S.W.3d 378, 392 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). If an exclusion or exception applies, "then Section 101.021(1)(A) of the Act does not waive the City's immunity from those claims regardless of whether they would

8

otherwise fall within the scope of that waiver." *City of San Antonio v. Maspero*, 640 S.W.3d 523, 529 (Tex. 2022); *City of Hous. v. Davis*, No. 01-13-00600-CV, 2014 WL 1678907, at *4 (Tex. App.—Houston [1st Dist.] Apr. 24, 2014, pet. denied) (mem. op.) ("When the exception applies, the [TTCA] is unavailable as a waiver of immunity even if the facts otherwise fall within . . . Section 101.021.").

One of the exceptions at issue here is section 101.055(2), the "Emergency Exception," which provides that the TTCA does not apply to a claim arising

> from the action of an employee while responding to an emergency call or reacting to an emergency situation if the action is in compliance with the laws and ordinances applicable to emergency action, or in the absence of such a law or ordinance, if the action is not taken with conscious indifference or reckless disregard for the safety of others.

TEX. CIV. PRAC. & REM. CODE § 101.055(2).

The other exception at issue in this case is section 101.062, the "9-1-1 Emergency Service" exception, which provides that the TTCA

> applies to a claim against a public agency that arises from an action of an employee of the public agency . . . and that involves . . . responding to a 9-1-1 emergency call only if the action violates a statute or ordinance applicable to the action.

*Id.* § 101.062(b).

Governmental immunity may be asserted in a plea to the jurisdiction, which challenges the trial court's subject-matter jurisdiction. *Miranda*, 133 S.W.3d at 224. We review a trial court's ruling on a plea to the jurisdiction de novo. *Chambers-Liberty Ctys. Navigation Dist. v. State*, 575 S.W.3d 339, 345 (Tex. 2019). A plea to

9

the jurisdiction may be utilized to challenge whether the plaintiff has met its burden of alleging jurisdictional facts or to challenge the existence of jurisdictional facts. *Miranda*, 133 S.W.3d at 226–27.

When a plea to the jurisdiction challenges the pleadings, we determine whether the pleader has alleged facts that affirmatively demonstrate the trial court's jurisdiction. *Id*. at 226. We construe the pleadings liberally in favor of the pleader, accept all factual allegations as true, and look to the pleader's intent. *Heckman v. Williamson Cty.*, 369 S.W.3d 137, 150 (Tex. 2012). If a plaintiff "fails to plead facts that establish jurisdiction, but the petition does not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and the plaintiff should be afforded the opportunity to amend." *Cnty. of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002).

Review of a plea challenging the existence of jurisdictional facts, however, mirrors that of a traditional summary-judgment motion. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012); *City of Hous. v. Guthrie*, 332 S.W.3d 578, 587 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("[T]his standard generally mirrors that of a summary judgment . . . . By requiring the [political subdivision] to meet the summary judgment standard of proof . . . , we protect the plaintiffs from having to put on their case simply to establish jurisdiction."); *see also* TEX. R. CIV. P. 166a(c). "[A] court deciding a plea to the

jurisdiction . . . may consider evidence and must do so when necessary to resolve the jurisdictional issues raised." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000). We may consider evidence as necessary to resolve a dispute over the jurisdictional facts even if the evidence "implicates both the subject matter jurisdiction of the court and the merits of the case." *Miranda*, 133 S.W.3d at 226. We take as true all evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Id*. at 228.

If the defendant meets its burden to establish that the trial court lacks jurisdiction, the plaintiff is then required to present jurisdictional evidence raising a material fact issue. *Id*. at 227–28. If the evidence raises a fact issue regarding jurisdiction, the plea cannot be granted, and a fact finder must resolve the issue. *Id*. On the other hand, if the evidence is undisputed or fails to raise a fact issue, the plea must be determined as a matter of law. *Id*. at 228.

### *9-1-1 Emergency Service Exception*

In its plea to the jurisdiction, the City argued that the jurisdictional evidence conclusively establishes that, even if the claims against it fall within the scope of the TTCA's waiver, the "9-1-1 Emergency Service" exception applies. *See Maspero*, 640 S.W.3d at 529 (holding that if exception applies, "then Section 101.021(1)(A) of the Act does not waive the City's immunity from those claims regardless of whether they would otherwise fall within the scope of that waiver").

11

As discussed above, the "9-1-1 Emergency Service" exception provides that, in claims arising from the action of a city employee responding to a 9-1-1 emergency call, immunity is waived "only if the employee's action violates a statute or ordinance applicable to the action." *See* TEX. CIV. PRAC. & REM. CODE § 101.062(b); *Guillen v. City of San Antonio*, 13 S.W.3d 428, 432 (Tex. App.—San Antonio 2000, pet. denied).

The law applicable to the operation of an emergency vehicle is found in Texas Transportation Code Chapter 546.[7] *See* TEX. TRANSP. CODE ch. 546 (governing operation of emergency vehicles); *City of Hous. v. Hussein*, No. 01-18-00683-CV, 2020 WL 6788079, at *7 (Tex. App.—Houston [1st Dist.] Nov. 19, 2020, pet. denied) (mem. op.). Section 546.001(2) provides that, "[i]n operating an authorized emergency vehicle the operator may . . . proceed past a red or stop signal or stop sign, after slowing as necessary for safe operation." *See* TEX. TRANSP. CODE § 546.001(2); *see also id.* § 546.002(b) (noting that section 546.001(2) applies when operator is responding to emergency call). Apart from inapplicable exception, the operator "shall use, at the discretion of the operator in accordance with policies of the department . . . , audible or visual signals." *Id.* § 546.003.

---

[7]     Vogel and Escalante assert, and the City does not dispute, that the applicable policies and ordinances mirror the applicable provisions of the Transportation Code.

Chapter 546 "does not relieve" the operator of an emergency vehicle from:

(1)    the duty to operate the vehicle with appropriate regard for the safety of all persons; or

(2)    the consequences of reckless disregard for the safety of others.

*Id.* § 546.005.  The Texas Supreme Court has concluded that, in section 546.005, "the Legislature intended for emergency vehicle operators in emergency situations to be cognizant of public safety, but only intended to impose liability for reckless conduct."  *City of Amarillo v. Martin*, 971 S.W.2d 426, 431 (Tex. 1998).

"Under the Transportation Code, reckless driving consists of driving a vehicle in willful or wanton disregard for the safety of persons or property."  *Maspero*, 640 S.W.3d at 531.  The standard requires "conscious indifference" or "subjective awareness of an extreme risk." *Id.*  Recklessness reflects "more than a momentary judgment lapse." *Id.*  Rather, it "requires a showing that the driver committed an act he knew or should have known posed a high degree of risk of serious injury." *Id.* "[C]onscious indifference" and "reckless disregard" "require proof that a party knew the relevant facts but did not care about the result."  *City of San Antonio v. Hartman*, 201 S.W.3d 667, 672 n.19 (Tex. 2006); *City of Pasadena v. Kuhn*, 260 S.W.3d 93, 99 (Tex. App.—Houston [1st Dist.] 2008, no pet.).

In its plea, the City argued that the 9-1-1 exception to the TTCA waiver applies because EMT Brooks was responding to an 9-1-1 emergency call and did not violate any applicable laws.  The City asserted that "it is undisputed that EMT

13

Brooks was operating the ambulance while responding to a 9-1-1 call with lights and siren active" and that "EMT Brooks did not only slow, but also stopped, at the stop sign, as well as checked for oncoming traffic, before entering the intersection."

The City's evidence shows that Brooks testified that he was responding to an "emergency call" and "had [his] lights and sirens on when [he] left the station." He noted that the weather was clear. He testified that, while traveling on Euel Street, he arrived at a stop sign at the intersection with Hardy Street, which is a four-lane, one-way street. His intent was to go straight across Hardy and continue on Euel. Brooks testified: "I stopped at the stop sign. I looked right. It was clear. I proceeded across." He noted construction "cones and barriers" in the "first two lanes of traffic" on Hardy and a tree near the intersection, but that they did not obstruct his vision of traffic. He proceeded, traveling at a rate of 20 miles per hour, across the first and second lanes of Hardy. As he crossed over the third lane, Vogel's truck struck the ambulance from the right side, causing the ambulance to roll onto its side.

EMT Brooks's passenger, EMT Ross, testified: "We came to a complete stop. We looked. We couldn't see anything. So we proceeded forward a little bit slowly and got a better view." Ross testified that "there were vehicles that were very far off" and that he did not see Vogel's truck until moments before it hit the ambulance.

Captain Gunnels testified that he was the station captain on duty, and EMT Brooks's supervisor, on the day of the collision. He testified that Brooks was

14

dispatched in response to a "911 emergency call." Gunnels testified that he arrived on the scene within minutes after the collision and investigated. He opined that, "to turn an ambulance over, you've got to be moving pretty fast."

Alexander Medina testified that he and a co-worker, Angel Huerta, were traveling down Hardy Street in a delivery truck, saw Vogel's truck, and witnessed the collision. Medina testified that he and Huerta:

> noticed that there was a truck that was next to us on the driver's side. So as we were passing by the light we were going down Hardy and we hear an ambulance and we see the lights. As the ambulance was trying to come across, we stopped and the truck just kept on going. And as soon as the truck hit the ambulance, the ambulance just spun. It spun out of control.

Medina opined that Huerta was "going at least 35 miles per hour" as they approached the intersection, but that Vogel's truck, "on the other hand, was going way beyond that" and passed them. Medina noted that he saw the ambulance "right there in the corner of the intersection," that he had a "clear view of the ambulance," and that "the lights and siren were on." He noted that, "[a]utomatically, we stopped," but Vogel's truck "just didn't stop."

Huerta testified that, although the windows of the delivery truck were closed and he was playing music, he heard the ambulance siren. He testified that he saw the ambulance "yield" at the intersection, but Vogel's truck was "coming too fast."

In *City of San Angelo Fire Department v. Hudson*, a fire truck collided with a motorist at an intersection. 179 S.W.3d 695, 698 (Tex. App.—Austin 2005, no pet.).

15

The motorist sued the city and asserted a waiver of immunity under the TTCA. *Id.* at 697. The city sought dismissal for a lack of subject-matter jurisdiction. *Id.* The fire truck driver, a city firefighter, testified that, at the time of the collision, he was responding to an emergency call, had his lights and siren activated, slowed as he reached the intersection at issue, and looked in both directions and determined that the intersection was clear, before proceeding into the intersection. *Id.* at 700–01. A witness testified that he heard the fire truck siren, stopped prior to entering the intersection, and observed that other vehicles had also yielded. *Id.* at 701. The court concluded that the city conclusively demonstrated that its firefighter had complied with the applicable statutes, namely, Transportation Code sections 546.001–.003 and .005, as a matter of law. *Id.* at 700–01.

Here, like in *Hudson*, the City's jurisdictional evidence established that EMT Brooks was responding to a 9-1-1 emergency call and that he had his lights and siren activated. *See* TEX. CIV. PRAC. & REM. CODE § 101.062(b); TEX. TRANSP. CODE § 546.003. The City's evidence also established that Brooks stopped at the stop sign, proceeded forward slowly and got a better view, looked for oncoming traffic, determined that the intersection was clear, and proceeded across. Thus, the City established that Brooks complied with the applicable laws, that he proceeded "after slowing as necessary for safe operation," and that he did not act with conscious indifference or reckless disregard for the safety of others. *See* TEX. TRANSP. CODE

16

§§ 546.001(2), .005; *Maspero*, 640 S.W.3d at 531; *Hudson*, 179 S.W.3d at 700–01; *see also Smith v. Janda*, 126 S.W.3d 543, 546 (Tex. App.—San Antonio 2003, no pet.) (holding evidence that ambulance driver was responding to emergency with lights and siren activated, which other drivers at subject intersection saw and heard, and that ambulance driver "slowed down and looked around" before proceeding into intersection, established as matter of law that ambulance driver was not reckless).

In their response to the City's plea, Vogel and Escalante did not dispute that EMT Brooks was responding to a 9-1-1 emergency call at the time of the collision or that the ambulance was traveling with its lights and siren activated. They conceded that "EMT Brooks came to a complete stop behind the stop sign on Euel" and that, "[a]fter coming to a complete stop behind the stop sign, EMT Brooks looked for traffic on Hardy." They argued, rather, that "fact issues exist concerning whether EMT Brooks entered the intersection despite being totally blocked from visually determining whether the intersection was clear." Specifically, they asserted:

> because of construction on southbound Hardy which blocked the two lanes closest to the ambulance, EMT Brooks had the opportunity to slowly cross into the blocked lanes and determine whether there was oncoming traffic in the far two southbound lanes; those lanes of traffic to which he owed a duty to yield to. Because EMT Brooks could not possibly identify oncoming traffic when he stopped at the stop sign—where it was admitted the view to the north was obscured by foliage and construction—and he failed to take any action to determine if there was oncoming traffic before proceeding into the intersection, he proceeded with reckless disregard for the safety of others, including [Vogel] and [Escalante].

17

Vogel and Escalante asserted that, "[i]f EMT Brooks entered into the intersection without determining whether the intersection was clear, his actions would constitute a violation" of section 546.001 because he "failed to 'slow as necessary for safe operation' and thus his actions constitute reckless behavior."

In support of their argument, Vogel and Escalante cite the following excerpts of EMT Brooks's deposition testimony:

Q.    So you made your decision then to cross Hardy Road at the stop sign? In other words, you made the decision to cross Hardy Road without stopping. You made that decision at the stop sign because you said you *never stopped any more in the intersection*, correct?

A.    Yes. Yes, sir. At the stop sign I decided to proceed across.

Q.    Right. Without stopping?

A.    Yes, sir.

(Emphasis added.)

Q.    All right. You then satisfied yourself —after you had come to a full stop behind the stop sign, you satisfied yourself that there was no traffic coming. Is that when you then proceeded into the intersection with your ambulance?

A.    Yes, sir.

Q.    Did you ever *stop any other time after you had already stopped behind the stop sign*?

A.    No, sir.

(Emphasis added.)

Vogel's and Escalante's burden was to present evidence raising a genuine issue of material fact as to a violation of the law by EMT Brooks. *See* TEX. CIV.

18

PRAC. & REM. CODE § 101.062(b) (providing that TTCA "applies to a claim against a public agency that arises from an action of an employee of the public agency . . . and that involves . . . responding to a 9-1-1 emergency call *only if the action violates a statute or ordinance applicable to the action*" (emphasis added)). They do not direct us to any authority supporting that Brooks, having come to a complete stop and having determined that the intersection and oncoming lanes were clear, was required to stop *again* "in the intersection," that is, in the moving lanes of Hardy Street.

The mere fact that a collision occurred is not evidence that EMT Brooks lacked regard for the safety of others at the time that he entered the intersection. *See Quested v. City of Hous.*, 440 S.W.3d 275, 286 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *Kuhn*, 260 S.W.3d at 100–01; *Hudson*, 179 S.W.3d at 702 (holding that mere observation that "large pumper truck 'slammed' into . . . car 'full force' does not provide evidence raising a fact issue about [officer's] regard for the safety of others or whether he slowed as necessary").

Vogel and Escalante also asserted that their evidence raised a fact issue because it showed that EMT Brooks was reckless in entering the intersection "completely blind." They presented photographs of the intersection at issue, which they asserted "show EMT Brooks' view of Hardy was *completely blocked* by construction, a house, parked box trucks, trees and shrubs." (Emphasis added.) The

19

record does not support their assertion. The photographs do not show that Brooks's view of Hardy was "completely blocked." Rather, the Exhibit 3 photograph shows a view of traffic on Hardy Street. Although plastic barriers and pylons appear, traffic behind them is readily visible. Their field diagram shows the stop sign located at the corner of the intersection, and the tree depicted in the photographs is shown in Exhibit 3 to be set back from the corner. There is not a house shown in the photographs attached their response to the City's plea.

Vogel and Escalante asserted that the following excerpt of Captain Gunnels's deposition testimony demonstrates that he "saw the obstructions that would have blocked EMT Brooks' view looking north down Hardy while stopped on Euel":

Q. Okay. Did Firefighter Brooks ever tell you that there either was or was not any sort of obstruction that kept him from seeing the intersection clearly?

A. He didn't tell me that, no.

Q. Okay. Have you heard that from other sources?

A. I saw it, myself.

Q. Okay. So you did see that there were some obstructions. Correct?

A. The first two lanes traveling west, crossing Hardy, were blocked by construction, by barriers, sandbags, and such, signs.

Q. Okay. Did you ever go back and look, when you were there, at the intersection, or where the stop sign was?

A. Yes.

Q. Did you notice any sort of trees, bushes, or other things that—

A. Yes.

Q. —could have created an obstruction, there?

A. Yes, there was a tree in front of the entirety of the stop sign.

20

Thus, Gunnels testified that he saw construction in the first two lanes of Hardy, which is undisputed and addressed above, and that there was a tree "in front of . . . *the stop sign*." (Emphasis added.) It is undisputed, however, that EMT Brooks heeded the stop sign. Thus, it could not have been totally obstructed. More importantly, the issue is whether Brooks could see oncoming traffic on Hardy Street, and Gunnels did not, in the cited testimony, state that the tree blocked Brooks's view of oncoming traffic on Hardy Street.

Vogel and Escalante asserted that EMT Brooks "acknowledged that there were obstructions that prevented him from seeing the traffic on Hardy," referring to a house and parked trucks situated behind him at the stop sign, as follows:

> Q. So *just from this photo*—and we're going to have some other photographs to look at. *Just from this photograph* that's up on the screen, the jury now knows that when you were stopped at the stop sign *over here* on Euel, you could not see through this house, you could not see through these trucks *back here* to see the traffic that was on Hardy Road *back here*. Correct?
>
> A. That's correct. Uh-huh.

(Emphasis added.) They also pointed to the deposition testimony of EMT Ross that, "behind" or before the stop sign, a house, foliage, and trucks on the right side of the ambulance "obstructed the early lanes" of traffic on Hardy Street. They also presented the expert affidavit of James Paul Evans, P.E., who opined that "trees and bushes near Mr. Brooks' stop sign would have obstructed the view of each driver."

21

However, notwithstanding whether the view of any lanes of Hardy Street were initially obstructed "behind" or "near" the stop sign, the record shows that EMT Ross testified that EMT Brooks, after he stopped, "proceeded forward" "slowly" and "got a better view," as follows:

> Q. So you're saying that the view of Firefighter Brooks would have been obstructed if he tried to look from behind the stop sign?
>
> A. Looking from behind the stop sign, I believe we could see that two lanes were under construction so we could have a better view if we proceed. *We came to a complete stop. We looked. We couldn't see anything. So we proceeded forward a little bit slowly and got a better view.*

(Emphasis added.) Brooks testified that his view was not obscured, that he determined that the lanes of travel were "clear," and that he proceeded across Hardy.

In *City of Pasadena v. Kuhn*, after a city police officer driving an emergency vehicle to a house fire collided with a motorist, the motorist argued that the officer was reckless for "blindly" entering the intersection at issue. 260 S.W.3d at 99–100. The motorist attached photographs to show that the intersection at issue was "blind" from the officer's standpoint and alleged that there was a "hedge row, a building, a marquee, as well as parked cars in the lot on the corner" that precluded the officer from seeing approaching vehicles "until just before the intersection." *Id.* at 97. This Court held that whether the intersection was blind did not create a material fact issue because the undisputed evidence showed that the officer was responding to an emergency, had activated his emergency lights and siren, recognized that he had a

22

red light, slowed down or stopped, and determined that it was safe to proceed before attempting to cross the intersection. *Id.* at 100. We noted: "Any intersection that an officer attempts to traverse when responding to an emergency is potentially a 'blind intersection.' That is why the statute provides that an emergency vehicle may proceed through a stop light after 'slowing as necessary.'" *Id.* (citing TEX. TRANSP. CODE § 546.001(2)). We concluded that the undisputed evidence showed that the officer followed those procedures. *Id.* We further concluded that the existence of a blind spot did not constitute evidence that the officer acted with conscious indifference or reckless disregard for the safety of others. *Id.* Thus, we held, the motorist did not demonstrate a material fact issue, and the city retained its immunity as a matter of law. *Id.* at 101.

Here, like in *Kuhn*, whether the intersection was "blind" did not create a material fact issue in light of the undisputed evidence that EMT Brooks was responding to a 9-1-1 emergency call, activated his lights and siren, came to a complete stop at the stop sign on Euel, and looked for traffic. The City also presented evidence that Brooks proceeded forward slowly and got a better view and determined that the intersection and oncoming lanes were clear before proceeding. Even if Brooks missed seeing Vogel, recklessness "reflects more than a momentary judgment lapse." *See Maspero*, 640 S.W.3d at 531. Rather, it requires "proof that

[Brooks] knew the relevant facts but did not care about the result." *Hartman*, 201 S.W.3d at 672 n.19. No such evidence was presented.

In support of their argument that EMT Brooks failed to slow as necessary and acted with recklessness, in violation of Transportation Code sections 546.001(2) and 546.005, Vogel and Escalante argue that this case is like *Gomez v. City of Houston*, 587 S.W.3d 891 (Tex. App.—Houston [14th Dist.] 2019, pet. denied), *Rivera v. City of Houston*, No. 01-19-00629-CV, 2022 WL 2163025 (Tex. App.—Houston [1st Dist.] June 16, 2022, no pet.) (mem. op.), and *City of Houston v. Green*, No. 14-20-00190-CV, 2022 WL 97334 (Tex. App.—Houston [14th Dist.] Jan. 11, 2022, pet. filed) (mem. op.). Their reliance on these cases is misplaced.

In *Gomez*, the police officer responding to an emergency call traveled on wet roads without reducing his speed to compensate, traveled without activating his siren, and admitted that he "looked down and away from the road as he approached the intersection" at issue. 587 S.W.3d at 902. Further, there was a fact issue as to whether he had activated his emergency lights. *Id.* In *Rivera*, the officer entered the intersection at issue without determining whether she was traveling against a red light and wholly failed to evaluate the risk of proceeding through the intersection. 2022 WL 2163025, at *7. Notably, she admitted that she was not looking at the road, but was instead typing a message to the dispatcher on her mobile data terminal. *Id.* In *Green*, the court concluded that the motorist raised a fact issue regarding

24

whether the officer's conduct was reckless because the evidence supported an inference that the officer entered the partially obstructed intersection at issue in the dark, without his sirens, and against a red light, without stopping. 2022 WL 97334 at *6. Thus, in each of these cases, unlike in the instant case, there was evidence of a total failure to evaluate the risks of entering the intersection at issue coupled with evidence of a failure to warn oncoming motorists of the emergency vehicle.

We conclude that Vogel and Escalante did not present evidence raising a genuine issue of material fact as to a violation of the law by EMT Brooks and that the City conclusively established that it retained its governmental immunity under the "9-1-1 Emergency Service" exception to the TTCA. *See* TEX. CIV. PRAC. & REM. CODE § 101.062(b); *Guillen*, 13 S.W.3d at 432–34. Accordingly, we hold that the trial court erred in denying the City's plea to the jurisdiction.

We sustain the City's sole issue.

## Conclusion

We reverse the trial court's order and render judgment dismissing Vogel and Escalante's suit against the City for want of jurisdiction.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Landau and Hightower.

25